**In re Alphonso D. ENRIQUEZ, and Daisy O. Enriquez, Debtors.**

**Bankruptcy No. 98–16174–B13.**

United States Bankruptcy Court,
S.D. California,
San Diego Division.

Jan. 7, 2000.

Brian A. Kretsch, Kretsch & Lobo, San Diego, for Debtor.

Eric D. Houser, Ryan M. Davies, Malcolm, Cisneros & Houser, Irvine, for FirstPlus Financial.

Scott N. Orona, Office of David L. Skelton, Chapter 13 Trustee, San Diego, Trustee.

## ORDER ON MOTION TO AVOID LIEN OF FIRSTPLUS FINANCIAL

PETER W. BOWIE, Bankruptcy Judge.

The Debtors seek to strip off the lien of the holder of the second priority deed of trust on their residence. The secured creditor argues that the Debtors are precluded from modifying its rights under Bankruptcy Code § 1322. The Debtors counter that the secured creditor is in fact not secured because insufficient equity exists in the residence to secure even a portion of its lien.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334 and General Order No. 312–D of the United States District Court for the Southern District of California. This is a core proceeding under 28 U.S.C. § 157(b)(2)(K).

### FACTS

The facts in this case are undisputed and straight-forward. Alphonso and Daisy Enriquez ("Debtors") hold title to the real property located at 2534 Manzana Way, San Diego, California ("Property"). The Property is the Debtors' primary residence. Western Interstate Bancorp, as successor in interest to FirstPlus Financial, Inc., holds a deed of trust which gives it a second priority lien on the Property. The lien is duly perfected.

On December 2, 1998, the Debtors filed a petition under Chapter 13 commencing the present case. On January 27, 1999,

the Debtors filed a notice of intended action to avoid the lien of Western Interstate Bancorp on the ground, though not clearly stated, that the claim is unsecured because the market value of the Property is less than the amount of the first priority lien. The Debtors declared that the Property had a fair market value of $159,000 as of the date of the petition and that the outstanding amount of the first was $183,-646.25.

Western Interstate does not dispute the Debtors' numbers. Rather, Western Interstate opposes the motion on the ground that its rights as a secured creditor cannot be modified pursuant to Bankruptcy Code § 1322(b)(2).

A continued hearing on the motion was held on August 17, 1999, at which time the Court invited further briefing on the recent decision of the Ninth Circuit Bankruptcy Appellate Panel in *In re Lam*, 211 B.R. 36 (9th Cir. BAP 1997), in which the BAP held a lien such as that held by Western Interstate could be stripped off. Western Interstate alone filed supplemental papers. The Court thereafter took the matter under submission.

## DISCUSSION

The Debtors seek, as have many before them, to avoid or "strip off" the lien of Western Interstate on the ground that it is not secured. It is undisputed that the amount owing on the first deed of trust, as of the date of the petition, exceeded the fair market value of the Property—there is no equity in the Property to secure the claim of Western Interstate under a § 506 analysis.

■■■ The threshold issue is a procedural one. As noted, debtors commenced the present effort to avoid Western Interstate's lien by filing and serving a Notice of Intended Action and Opportunity for Hearing. The theory of the Notice was that the lien was avoidable under the rationale of 11 U.S.C. § 506 and the decision in *In re Geyer*, 203 B.R. 726 (Bankr.S.D.Cal.

1996). This Court has found no authority for use of a Notice of Intended Action in such a situation. If the basis for the motion had been that the lien impaired an exemption, and was otherwise avoidable under 11 U.S.C. § 522(f), then avoidance by motion would have been a permissible procedure. Rule 4003(d), Federal Rules of Bankruptcy Procedure. In the absence of a rule authorizing use of a motion to avoid a lien, however, an adversary proceeding must be brought. *See*, e.g., *Brady v. Andrew*, 761 F.2d 1329, 1336 (9th Cir.1985). Specifically, Rule 7001, Federal Rules of Bankruptcy Procedure, provides in relevant part:

> The following are adversary proceedings:
>
> . . .
>
> (2) a proceeding to determine the validity, priority, or extent of a lien or other interest in property, other than a proceeding under Rule 4003(d);
>
> . . . .

The Court notes that even in the seminal case on which debtors rely, *In re Lam*, 211 B.R. 36 (9th Cir. BAP 1997), the debtors there correctly filed an adversary proceeding to attempt to strip off the creditor's lien.

Here, the debtors have failed to present their issue in a permissible procedural context. As *Commercial Western Finance* teaches, the result debtors seek—strip off of Western Interstate's lien, cannot be obtained without commencement of an adversary proceeding.

The Court recognizes the issue raised by the instant motion is a recurring one in Chapter 13 cases and, further, debtors have an incentive to bring the requisite adversary to correctly posit the issue. Moreover, the parties have fully briefed the merits of the issue, and the Ninth Circuit Court of Appeals has determined to not address the merits of *In re Lam* because of the non-participation throughout of the adversely impacted creditor. Accordingly, the Court offers the following

as some guidance of how it would resolve the issue.

### Stare Decisis Authority of the BAP

As noted, the BAP has held that a consensual lien may be stripped off in a Chapter 13 case notwithstanding 11 U.S.C. § 1322. *In re Lam,* 211 B.R. 36 (9th Cir. BAP 1997). The first issue, then, is whether this Court is bound by the BAP's decision.

The *stare decisis* effect of a decision of the BAP—that is, the extent to which it is binding on bankruptcy courts in the same circuit—is an area of uncertainty. *See* e.g., *Bank of Maui v. Estate Analysis, Inc.,* 904 F.2d 470, 472 (9th Cir.1990) (even though BAP had already adversely decided the issue, the BAP decision's "binding effect is so uncertain that it cannot be the basis for sanctioning a party for seeking a contrary result in a district where the underlying issue has never been resolved.") Clearly, if the BAP's decision in *Lam* is binding, this Court has no discretion, and *Lam* would control.

In *In re Muskin, Inc.,* 151 B.R. 252 (Bankr.N.D.Cal.1993), Judge Alan Jaroslovsky makes a good case for the proposition that decisions of the BAP ought generally to be binding. The parties are encouraged to review his discussion at pages 254–55.

■ Notwithstanding the merits of the arguments in *Muskin,* and the general desirability of a circuit-wide rule on the issue (as suggested in the concurring opinion in *Bank of Maui*), this Court concludes in light of *Bank of Maui* that as a matter of law it is not bound by a decision of the Ninth Circuit BAP unless the decision made by the BAP was in the very case before this Court. Absent that circumstance, decisions of the BAP are persuasive authority on the issues they have decided. Indeed, in this Court's experience

they are generally very persuasive. But they are not controlling.

In the context of the issue raised in *Lam,* the Court finds that decision less persuasive than usual, in part because there was no participation by the creditor in the appellate process. Those circumstances have apparently persuaded Judge Dorian, as well, that *Lam* is not persuasive. *In re Ortiz,* 241 B.R. 460 (Bankr. E.D.Cal.1999). Accordingly, the Court turns to the issue of whether § 1322 prohibits stripping off a wholly unsecured consensual lien on property which is the debtors' principal residence and which serves as the only collateral for the creditor's lien.

### "Stripping Off" Under § 1322

■ Bankruptcy Code § 1322(b)(2) allows a debtor's Chapter 13 plan to "modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence.*"[1] The Debtors in this case wish to "modify" Western Interstate's purported secured claim by having it declared an unsecured claim.

Western Interstate argues that its rights may not be modified as its claim is "secured only by a security interest in real property that is the debtor's principal residence."

Relying upon Bankruptcy Code § 506(a), which provides that a claim is only secured to the extent of the value of the creditor's interest in the debtor's property, Chapter 13 debtors have long sought to reduce or eliminate the secured claims of junior lienholders to the extent the equity in the property was less than the amount of the claim.

Where there is some equity in the property for the junior lienholders debtors have sought to reduce the secured claim to the extent of such equity—this is referred

---

**1.** (b) Subject to subsections (a) and (c) of this section, the plan may—

(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

to as "stripping down." Where there is no equity in the property, that is the value of the property is less than the claim of senior lienholders, debtors have sought to eliminate the secured claim entirely—this is referred to as "stripping off."

The practice of "stripping down" a partially secured claim was dealt a definitive death blow by the Supreme Court in *Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). In *Nobelman* the Court held that § 1322(b)(2) precluded a Chapter 13 debtor from bifurcating a secured creditor's claim and "stripping down" the unsecured portion.

The facts of the *Nobelman* decision, however, did not reach the issue of whether a totally unsecured claim may be "stripped off." This question has been the subject of numerous decisions on both sides of the issue. Some courts have held that the rule of *Nobelman* extends to protect creditors whose liens are totally unsecured. Other courts, including the BAP, have held that the protection of *Nobelman* and § 1322(b)(2) does not extend to a wholly unsecured claim.[2] Commentators have noted that the statutory language is not dispositive and the issue is susceptible to reasonable argument either way. *See* e.g., Lawrence Ponoroff, Modifying Wholly Unsecured Home Mortgage Loans in Chapter 13: If They're Under Water, Let 'Em Drown., 7 Journal of Bankruptcy Law and Practice 625 (1998).

The position that forbids stripping off is referred to as the minority position, but has acquired several recent followers. *See* e.g., *In re Boehmer*, 240 B.R. 837 (Bankr. E.D.Pa.1999); *In re Cater*, 240 B.R. 420 (M.D.Ala.1999); *In re Tanner*, 223 B.R. 379 (Bankr.M.D.Fla.1998); *In re Perry*, 235 B.R. 603 (S.D.Tex.1999); and *In re Virello*, 236 B.R. 199 (Bankr.D.S.C.1999).

The Court is aware of no circuit decision on the issue. The court in *Boehmer* ably

expressed the situation faced by this Court:

> [U]ntil there is congressional action, or at least controlling appellate precedent, the situation is unlikely to remedy itself. Each judge will simply have to determine which of the two competing positions is to him or her the most persuasive. This Court, regrettably, finds itself unable to offer fresh insights into this nettlesome question, but it has carefully considered the many arguments which have been made and discussed by others.

240 B.R. at 842.

In this Court's view, the *Lam* decision stands *Nobelman* and its teachings on its head. The result obtained in *Lam* may or may not be a desirable policy choice, particularly when some lenders offer loans of 125% of the market value of the property. But policy choices about how to treat those interests are for legislatures to make, not courts.

Justice Stevens, in his concurring opinion in *Nobelman*, makes a central point. Congress granted special and unusual treatment to lenders on residential mortgages in Chapter 13 cases "to encourage the flow of capital into the home lending market." 508 U.S. at 332, 113 S.Ct. 2106. Ironically, the BAP uses a bankruptcy court decision to suggest there was no congressional interest in recognizing the secondary mortgage market. The legislative history of § 1322 reflects no such distinction. If one is to be made, it is for Congress to do so, not the courts.

While 11 U.S.C. § 1322(b)(2) permitted a Chapter 13 debtor to "modify the rights of holders of secured claims", it expressly excepted from that power the claims of creditors "secured only by a security interest in real property that is the debtor's principal residence . . . ." The BAP in *Lam* purports to say that notwithstanding that clear legislative intent the court refuses to

---

**2.** The parties can find an extensive, though non-exhaustive, break-down of the two lines of cases at *In re Boehmer*, 240 B.R. 837, 840–842 (Bankr.E.D.Pa.1999).

give it effect when, in their view, the security interest is empty. But that analysis begs a number of questions.

*Nobelman* instructs us "that § 1322(b)(2) cannot operate in combination with § 506(a) in the manner theorized by petitioners." *Id.* *Lam* ignores that teaching and, instead, says when the security interest is attached to no equity *because of application of § 506(a)*, then the prohibition of § 1322(b)(2) is not violated. But that is directly contrary to both the teachings and the holding of *Nobelman.*

*Nobelman* also tells us that § 1322(b)(2) was intended to prevent the modification of the "rights" of the holder of the security interest. Further, we are reminded that state law generally tells us what those rights are. *Lam* pays lip service to that notion, but then overlooks a number of "rights" which the creditor has under state law. In *Lam*, the court wrote:

> An analysis of the state law "rights" afforded a holder of an unsecured "lien", if such a situation exists, indicates these rights are empty rights from a practical, if not a legal standpoint.

211 B.R. at 40. Without explanation or citation to any authority, the BAP then makes the bald statements:

> A forced sale of the property would not result in any financial return to the lienholder, even if a forced sale could be accomplished where the lien attaches to nothing. Nothing secures the "right" of the lienholder to continue to receive monthly installment payments, to retain the lien until the debt is paid off, or the right to accelerate the loan upon default, if there is no security available to the lienholder to foreclose on in the event the debtor fails to fulfill the contract payment obligations.

*Id.* Except for the notion that a forced sale may not yield any money at the moment in time the creditor is wholly without equity, the statements are wrong.

Under applicable state law, when a mortgage lender enters into a promissory note and trust deed arrangement with a person, the lender acquires a number of rights, including the right to foreclose on the interest of the obligor upon default. If the obligor is in arrears to a senior lienholder, the junior lienholder has the right to cure the arrearage to preserve its position. Most importantly, the junior lienholder has the "right" to gamble that the property will appreciate over time and that at some point in time in the future, if a forced sale becomes necessary, there will be economic value remaining for the junior lienholder. Allowing a debtor in Chapter 13 to pick one point in time and say that at that point in time there is no value in the property to which the security interest can attach, and therefore the creditor's contractual lien "rights" should be extinguished clearly is a modification of those rights within the meaning of § 1322(b)(2) and *Nobelman,* and is prohibited by the express language of that statute and the teachings of *Nobelman.*

One of the errors in the analysis in *Lam* by the BAP is in thinking that under state law rights granted to a creditor under a note and deed of trust somehow depend upon the existence of value or equity in the collateral to which a security interest can attach. That is not the law of the state, nor has the BAP suggested any authority exists for that proposition. To the contrary, under state law a creditor's rights are fixed by the terms of the contracts between the parties, and are not dependent for their effectiveness on the existence at any particular moment in time of value or equity in the collateral to which those "rights" can attach.

This Court ultimately concludes that Congress intended by § 1322 to afford a unique protection to lenders whose sole security is the primary residence of a Chapter 13 debtor regardless of the value of the property or extent of senior liens as of the petition date. There is no indication that the protection was to be limited to lenders whose equity position had not been eroded as of the petition date. The BAP

in *Lam* attempted to distinguish between first mortgages, which are generally purchase money, and seconds, which the BAP suggests are not entitled to the same deference. Surely, however, Congress was aware that purchase money lenders were not the only ones who would have a security interest in a debtor's residence. Had they intended to protect only purchase money lenders they could have done so expressly, as they did in § 522(f).

Furthermore, the majority position can lead to absurd results. The oft-used example was set out in *Lam*:

> For example, a one dollar difference in property value could have a profound effect on a secured creditor's rights. If property valued at $50,000 is encumbered by a first mortgage of $50,000 and a second mortgage of $20,000, the second mortgage has no secured claim under section 506(a). According to *In re Plouffe*[, 157 B.R. 198 (1993)] and the other cases following *Nobelman*, the second mortgagee's rights can be completely modified under section 1322(b)(2). However, if an appraiser values the property at $50,001, the second mortgagee has a secured claim of $1 and under *Nobelman* no modification of the secured creditor's rights is permissible under section 1322(b)(2).

*Lam*, 211 B.R. at 41. The BAP in *Lam* discounted the concern: "We believe this concern to be unfounded..." *Id.* This Court disagrees, particularly when a Chapter 13 plan can be in place 3–5 years before completion and discharge. Certainly the potential disparity might be outweighed by countervailing policy concerns, but it is a factual possibility—it is not unfounded. Furthermore, the Court finds it a concern of substantial importance to lenders. The Court can think of no policy reason for treating junior lienholders differently based solely upon whether a slim amount of equity exists as of the petition date, given the purpose of § 1322(b)(2) and the teachings of *Nobelman*.

For these reasons, and many of those expressed by the other courts holding that § 1322 precludes stripping off of any qualifying liens, the Court would so hold.

## CONCLUSION

For all of the foregoing reasons, the Court would hold that the Debtors may not strip off Western Interstate Bancorp's lien. The Debtors' motion to avoid lien is denied for the reasons stated, and with the future guidance as offered.

IT IS SO ORDERED.