**In the Matter of Ronald Lee WOODWARD, Diane Mildred Woodward, Debtors.**

**No. 00–00819–CJ.**

United States Bankruptcy Court,
S.D. Iowa.

Feb. 23, 2001.

Paul D. Grandy, Fairfield, IA, for Debtors.

Barbara G. Stuart, Des Moines, IA, United States Trustee for Region 12, by James L. Snyder, Assistant U.S. Trustee.

## MEMORANDUM OF DECISION

LEE M. JACKWIG, Bankruptcy Judge.

Barbara G. Stuart, the United States Trustee for Region 12 ("U.S. Trustee"), filed an 11 U.S.C. section 707(b) motion to dismiss this Chapter 7 case. She contends permitting Debtors Ronald Lee and Diane Mildred Woodward ("Debtors") to proceed with this liquidation case would be a substantial abuse of the provisions governing Chapter 7 because the Debtors have the ability to pay a significant percentage of their consumer debt. The Debtors disagree. Having conducted an evidentiary hearing on the controversy and having reviewed the record and the arguments of the parties, the Court now enters its decision.

The Court has jurisdiction of this matter pursuant to 28 U.S.C. section 1334 and the standing order of reference entered by the District Court for the Southern District of Iowa. This is a core matter under 28 U.S.C. section 157(b)(2)(A) and (O).

## BACKGROUND

On March 14, 2000 the Debtors filed a petition for relief under Chapter 7 of the United States Bankruptcy Code. On the same date they filed their Schedules and Statement of Financial Affairs. On Schedule D (Creditors Holding Secured Claims), the Debtors indicated they owed $217,976.23 in secured debt. On Schedule E (Creditors Holding Unsecured Priority Claims), they reported they owed nothing in unsecured priority debt. On Schedule F (Creditors Holding Unsecured Nonpriority Claims), they listed $76,401.11 in unsecured nonpriority debt.[1]

On Schedule I (Current Income of Individual Debtors), the Debtors reported that Mr. Woodward has been employed in sales with Sitler Electric since March 1986 and Mrs. Woodward has been employed as a teacher with Southern Prairie since 1993. His monthly gross income was $4,000.00 and hers was $2,377.50. After all deductions and adjustments were taken into account, his net monthly income was $2,003.84[2] and hers was $1,576.12. Their combined net monthly income was $3,579.96. They listed no dependents. On Schedule J (Current Expenditure of Individual Debtors), the Debtors indicated their monthly expenses totaled $4,202.24.

On June 20, 2000 the U.S. Trustee filed the pending motion to dismiss, in which she alleged the Debtors understated Mr. Woodward's net monthly income and overstated some of their expenses. Based on Mr. Woodward's 1999 W–2 Statement, the U.S. Trustee calculated his average monthly gross income at $4,002.20—a gross amount only $2.20 higher than that reported on Schedule I. Nevertheless, the U.S. Trustee maintained the Debtors overstated Mr. Woodward's monthly deductions and, therefore, his average net monthly income should be $2,918.19[3]—a net amount significantly greater than that reported on Schedule I.

As for the Debtors' monthly expenses, the U.S. Trustee increased the allowance for rent or home mortgage because the Debtors indicated in their Statement of Intention that they would be surrendering

---

1. The parties do not dispute the Debtors' debts are primarily consumer debts.

2. The figure includes $156.00 income from real property.

3. The figure does not include the real property income.

their homestead. In turn, the U.S. Trustee eliminated property tax and the installment payment on the second mortgage from the Debtors' expenses. In keeping with prior bankruptcy court decisions in this district, the U.S. Trustee reduced the amounts shown on Schedule J for telephone, cable/satellite and transportation and increased the food allowance. She eliminated expenses for life, home and health insurance. She contended the latter two were duplicative of other expenses or deductions.[4] The U.S. Trustee also eliminated the amount shown for a student loan debt on the ground such expense was primarily the obligation of the Debtors' son.

According to the U.S. Trustee's adjusted calculations, the Debtors' combined net monthly income was $4,650.00[5] and their monthly expenses totaled $2,718.00. She contended the resulting disposable monthly income of $1,932.00 would pay off 91.04% of Debtors' unsecured nonpriority debts in three years and 151.73% in five years.

The Court conducted a preliminary telephonic hearing on the controversy on July 19, 2000. At the conclusion of the hearing, the Court entered an order setting certain deadlines and scheduling the matter for an evidentiary hearing.[6]

On August 9, 2000 the Debtors faxed to the Court a certification regarding their change in financial status.[7] They represented their transportation costs had increased from $350.00 at the time of filing to $650.00 due to a rise in the price of gasoline.

On August 22, 2000 the Debtors filed amendments to Schedules I and J and to their Statement of Intention. The Debtors changed Mr. Woodward's monthly gross income to $4,002.20 and his net monthly income to $2,962.05.[8] Mrs. Woodward's income remained the same. Accordingly their total combined net monthly income increased to $4,538.17.

As for the challenged expenses, the Debtors only agreed with the increase in their food allowance and the elimination of the amount for health insurance. As reflected by the attached chart, they left the amounts in seventeen categories unchanged and increased the amounts in four others. With respect to the latter, they changed home maintenance from $25.00 to $100.00, clothing from $50.00 to $125.00, transportation from $350.00 to $650.00, and recreation from $25.00 to $50.00.

---

4. The allowed amount for auto insurance included home insurance. The U.S. Trustee also cited the surrender of the home as a basis for her adjustment of this expense item. Deductions for health insurance appeared on Schedule I.

5. For the purpose of the final calculations, the U.S. Trustee rounded off her net monthly income figure of $4,650.31. The figure does include the real property income.

6. The Court affords debtors an opportunity to fine-tune the amounts set forth on Schedules I and J if those documents do not accurately reflect the financial situation of the debtors as of the petition date. Though the Court does not condone the submission of any inaccurate information by any party at any time, the Court realizes that petitions and schedules are sometimes prepared in haste. The invitation permits more serious reflection based on available historical documentation. It is not meant to signal a second chance to deflate income figures and to inflate expense figures as needed to overcome a section 707(b) motion. Finally, if the financial situation of the debtors changes significantly postpetition for reasons beyond their control, they must file an affidavit to that effect.

7. On September 21, 2000 the Debtors submitted the original document and the Clerk of Court filed it.

8. The figure again includes the $156.00 income from real property.

These various adjustments increased their monthly expenses to $4,522.89. Moreover, in their amended Statement of Intention, the Debtors indicated they would retain their homestead by reaffirming the two mortgages against it.

On August 23, 2000 First Iowa State Bank filed a motion for relief from stay to permit it to foreclose its mortgage on the homestead. The stated bar date for objections was August 31, 2000.

The Court conducted the evidentiary hearing on September 1, 2000. The U.S. Trustee relied on Exhibits A (Calculation of Income) and B (Monthly Expenses, Disposable Monthly Income, and Repayment Capacity) that were attached to her motion to dismiss. The Debtors offered and the Court received Exhibits 1, 2 and 4 through 7. The United States Trustee called two witnesses: Louis Todd Vandenberg, who is the U.S. Trustee's Bankruptcy Analyst for the Southern District of Iowa, and Mr. Woodward.

During opening arguments, the U.S. Trustee indicated a willingness to accept the income figures reflected on Debtors' amended Schedule I since the difference between their combined net monthly income amount and that reflected on Exhibit A was minimal. However, Mr. Woodward later testified that amended Schedule I was in error. There was no monthly $112.14 deduction for insurance from his income. Hence, the Debtors ultimately agreed Exhibit A was correct.

The remainder of the testimony focused on the various challenged expense items. Mr. Vandenberg explained the U.S. Trustee's rationale behind the recommendations that were in issue. His testimony was based on nine years' experience preparing Schedule J calculations for section 707(b) hearings. He noted that the amounts proposed by the U.S. Trustee took into account past rulings by the judges in this district. With the exception of the allowance requested for home and auto insurance, Mr. Woodward testified that the amounts set forth on amended Schedule J reflected what he and his wife had been spending or, in the case of the two home mortgages, should have been spending in recent months.

During closing argument, the Court asked Debtors' counsel whether he would be filing an objection to the pending motion for relief from stay filed by the first mortgage holder on the Debtors' homestead.[9] Debtors' counsel indicated the Debtors would not be resisting the motion for relief from stay.[10]

## APPLICABLE LAW

■■■ 11 U.S.C. section 707(b) provides in relevant part:

> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of

---

**9.** The August 31, 2000 bar date for objections was automatically extended to September 5, 2000 by operation of Federal Rule of Bankruptcy Procedure 9006(a) and (f). Subsection (f) provides: "When there is a right or requirement to do some act or undertake some proceedings within a prescribed period after service of a notice or other paper and the notice or paper other than process is served

by mail, three days shall be added to the prescribed period." Subsection (a) provides in part: "The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday..."

**10.** On September 7, 2000 the Court entered an order granting the uncontested motion for relief from stay.

relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

11 U.S.C. section 707(b). The Eighth Circuit substantial abuse inquiry focuses primarily on an individual debtor's ability to pay his or her debts. *See In re Koch*, 109 F.3d 1285, 1288 (8th Cir.1997); *U.S. Trustee v. Harris*, 960 F.2d 74, 77 (8th Cir. 1992); *Fonder v. United States*, 974 F.2d 996, 999 (8th Cir.1992); *In re Walton*, 866 F.2d 981, 984–85 (8th Cir.1989). The ability to pay is typically measured by assessing how much disposable income a debtor would be able to pay his or her unsecured creditors under a three to five year Chapter 13 plan. *See Koch*, 109 F.3d at 1288. 11 U.S.C. section 1325(b)(2) defines "disposable income" as follows:

> "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—
>
> (A) for the maintenance or support of the debtor or a dependent of the debtor ... and
>
> (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(2). The controlling circuit case law does not require a trial court to find a debtor can pay a specific threshold of unsecured debt over three to five years before that court may conclude

the Chapter 7 filing amounts to substantial abuse. Rather, "the essential inquiry remains whether the debtor's ability to repay creditors with future income is sufficient to make the Chapter 7 liquidating bankruptcy a substantial abuse of the Code." *Fonder*, 974 F.2d at 999.

■■■ Finally, neither section 707(b) nor its legislative history suggest Federal Rule of Evidence 301 would not apply in this case.[11] Accordingly, a U.S. Trustee has the burden of rebutting or meeting the section's presumption in favor of a debtor. Nevertheless, a debtor must file a schedule of current income and current expenditures in support of the Chapter 7 petition. 11 U.S.C. § 521(1). Those schedules must be accurate. Fed. R. Bankr.P. 1008.[12]

## DISCUSSION

Resolution of the pending controversy first requires the Court to determine how much disposable income the Debtors will likely have in the next three to five years. Then the Court must decide whether allowing the debtors to retain that amount in lieu of paying their unsecured debts is a substantial abuse of the Chapter 7 provisions.

### I. The Disposable Income Calculation.

The parties no longer disagree over the amount of the Debtors' monthly income. They continue to dispute whether certain of the Debtors' expenses are accurate and reasonable.

---

**11.** Federal Rule of Evidence 301, made applicable to bankruptcy cases and proceedings by Federal Rule of Bankruptcy Procedure 9017, provides:

> In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof

in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast. Fed.R.Evid. 301.

**12.** Federal Rule of Bankruptcy Procedure 1008 provides that "[a]ll petitions, lists, schedules, statements and amendments thereto shall be verified or contain an unsworn declaration as provided in 28 U.S.C. § 1746."

## Monthly Income

The U.S. Trustee relies on the calculations set forth on Exhibit A. The Debtors accept the U.S. Trustee's determination of their combined net monthly income.

Though Mr. Woodward testified that he also receives some weekly expense money from his employer, the record is devoid of any documentation that evidences that amount. That is, Schedule I does not set forth any such income and Schedule J does not specifically refer to any related business expenses. Accordingly, the Court will assume for this portion of the discussion that the additional income would have no impact on the bottom line of the U.S. Trustee's income calculation.

Therefore, the Court finds the Debtors' combined net monthly income to be the $4,650.00 figure reflected on Exhibit A.

## Monthly Expenses

*Certain Home-related Expenses: (1) Home Mortgage*—The U.S. Trustee recommends $900.00 while the Debtors request $788.56; *(2) Property Taxes*—The U.S. Trustee recommends no allowance while the Debtors request $200.00; and *(3) Second Mortgage*—The U.S. Trustee recommends no allowance while the Debtors request $865.20.

The U.S. Trustee's objection is based on the Debtors' original Statement of Intention in which they indicated they would surrender their current homestead. The Debtors amended that statement to represent the exact opposite. Debtors argue they may amend their Statement of Inten-

tion at any time before the case is closed. The U.S. Trustee questions the Debtors' timing vis-à-vis the filing of the section 707(b) motion. That is, the Debtors filed their original Statement of Intention with their Petition, Schedules and Statement of Financial Affairs on March 14, 2000. The U.S. Trustee filed the pending motion on June 20, 2000. The Debtors amended their statement on August 22, 2000.

■ Federal Rule of Bankruptcy Procedure 1009(b) (Statement of Intention) provides: "The statement of intention may be amended by the debtor at any time before the expiration of the period provided in 521(2)(B) of the Code. The debtor shall give notice of the amendment to the trustee and to any entity affected thereby." [13] 11 U.S.C. section 521(2)(B) requires: "[W]ithin forty-five days after the filing of a notice of intent under this section, or within such additional time as the court, for cause, within such forty-five day period fixes, the debtor shall perform his intention with respect to such property,...."

■ Clearly, the Debtors did not file the amended Statement of Intention by April 28, 2000—the forty-fifth day after they filed their original statement.[14] They did not seek and the Court did not otherwise grant additional time for them to comply with section 521(2)(B). Therefore, the Court concludes it must consider the U.S. Trustee's recommendations and the Debtors' requests in light of the first Statement of Intention.

---

**13.** Federal Rule of Bankruptcy Procedure 1009(a)(General Right To Amend) states in part: "A voluntary petition, list, schedule or statement may be amended by the debtor as a matter of course at any time before the case is closed." The Debtors' reliance on this general right is misplaced. It does not apply to a statement of intention. As indicated in the Advisory Committee Note for 1987, subdivision (b) of the Rule is specific and controls amendments to such statements.

**14.** The Court file reflects the Debtors did not serve the amended statement on the two creditors that held mortgages against the homestead.

■ On direct examination, Mr. Vandenberg testified he increased the Debtors' requested amount for the home mortgage expense to "$900.00 to include a new, suitable home with taxes, insurance, and the whole lot there." (Tr. at 10, ¶¶ 14–15.) Accordingly, he deleted the amounts requested for property tax and the second mortgage from the monthly budget. On cross-examination, he further explained that his calculation "was based upon either a rental situation or a purchase of a home with a value of, say, maybe eighty to ninety thousand dollars, somewhere in there." (Tr. at 17, ¶¶ 7–10.) He otherwise agreed that he had seen home allowances of greater and lesser amounts.

Mr. Woodward's testimony with respect to the three line items under consideration was not helpful because it was based on the amended Statement of Intention. He did not give the Court any reason to question the reasonableness of Mr. Vandenberg's recommendation for a family of two living in Albia, Iowa. Accordingly, the Court will allow a home mortgage (or rent) expense of $900.00 and will not allow any separate amount for property tax or any amount for the second mortgage.

■ Had the Debtors timely amended their Statement of Intention, the issue would have been whether that amendment was credible. Certainly, the amended statement on its face supports the Debtors' requests for the home-related expense items under consideration. Arguably, including those items in their monthly budget would lessen significantly the amount of disposable income available for unsecured creditors in a hypothetical Chapter 13 plan. The Court of Appeals for the Eighth Circuit, however, has cautioned that the primary focus on the ability to pay "is not to say that inability to pay will shield a debtor from section 707(b) dismissal where bad faith is otherwise

shown." *Walton,* 866 F.2d at 984–85 (quoting with favor *Zolg v. Kelly (In re Kelly),* 841 F.2d 908, 914–15 (9th Cir. 1988)).

■ Then, in the subsequent *Harris* decision, the Court of Appeals for the Eighth Circuit attempted to distinguish its *Walton* decision from the Fourth Circuit's "totality of the circumstances approach" that takes the following factors into consideration:

(1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

(2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

(3) Whether the debtor's proposed family budget is excessive or unreasonable;

(4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and

(5) Whether the petition was filed in good faith.

*U.S. Trustee v. Harris,* 960 F.2d 74, 76–77 (8th Cir.1992) (referencing *In re Green,* 934 F.2d 568 (4th Cir.1991)). The *Harris* panel reasoned:

[W]e do not read *Walton* as adopting the "totality of the circumstances" approach that the Fourth Circuit adopted in *Green.* To the contrary, as we have indicated, the district court correctly interpreted *Walton* as contemplating that "the ability to fund a chapter 13 plan can be sufficient reason to dismiss a chapter 7 petition under § 707(b)."

Although *Walton* stated that "the court may take the petitioner's good faith and unique hardships into consideration under section 707(b)," 866 F.2d at 983, that statement does not contemplate the sweeping and free ranging inquiry that the Fourth Circuit apparently

required in *Green.* Indeed, we think that our narrower standard for determining "substantial abuse" in *Walton,* following the 9th Circuit *Kelly* decision, comports more with the Congressional purpose in § 707(b) than the 4th Circuit's broader standard in *Green.*

*Harris,* 960 F.2d at 77. Accordingly—but not without some difficulty, this Court reconciles the *Walton–Harris* precedent to mean that the *Green* factors may be relevant and material to a section 707(b) analysis if they either bolster the argument that the debtor has the ability to fund a Chapter 13 plan or if they establish substantial abuse in the absence of such an ability. On the other hand, *Green* inquiries yielding favorable findings for a debtor who otherwise has the ability to fund a Chapter 13 plan are of no consequence.

In this case, the Debtors initially indicated they intended to surrender their home. Performance of that intention would have freed them of any dischargeable recourse debt on the first and second mortgages upon entry of the general discharge order.[15] The decision to surrender the homestead appeared to be a logical one because Mr. Woodward's testimony and the Debtors' schedules reflected that they had little, if any, equity in their current home.[16] Yet, after the U.S. Trustee filed the section 707(b) motion, the Debtors changed their Statement of Intention to indicate they would be reaffirming the recourse and nonrecourse debt against their current home.[17] Mr. Woodward explained that "[b]asically, our local bank is handling it; and in discussion with them, they are encouraging us to try to work it out and keep the house too." (Tr. 48, ¶¶ 5–7.)[18] He nevertheless acknowledged an earlier discussion with the second mortgage holder had not yielded any results.[19] Finally, as of the date of the evidentiary hearing, the Debtors had not reaffirmed their mortgage obligations even though the debts were not current.[20] Indeed their counsel

15. The Court docket reflects neither mortgage holder has commenced a complaint to determine dischargeability and no party in interest has objected to the Debtors receiving a general discharge of debt. The time to bring such actions has passed.

16. On Schedule A (Real Property), Debtors indicate the current market value of their interest in the homestead is $90,000.00 and the amount of secured claims against that property is $151,481.94. On Schedule D (Creditors Holding Secured Claims), they consistently report the value of the property is $90,000.00 and they owe First Iowa State Bank $92,000.00 and Empire Funding Corporation $59,481.64. At the time of the hearing, Mr. Woodward testified that the $90,000.00 value was an estimate in the context of an auction or foreclosure sale. He subsequently obtained a realtor's opinion that valued the home between $142,000.00 and $155,000.00. Those figures, however, did not take into account any sales commission or costs.

17. The Court file reflects the Debtors have not claimed their homestead exempt from the bankruptcy estate. The trustee has not filed a notice of abandonment of any property of the estate. The trustee, however, did not object to the first mortgage holder's motion for relief from stay.

18. Mr. Woodward testified that the Debtors obtained the first mortgage, a five-year balloon arrangement, in 1994. They restructured that debt in 1999.

19. Mr. Woodward stated that the Debtors incurred a $65,000.00 mortgage with Empire Funding Corporation in 1997. They spent a portion of the funds to have a patio poured. They used the rest to pay off certain debts.

20. Some circuit courts of appeals permit a debtor to retain encumbered property without reaffirming the underlying debt if the debtor is current on the obligation at the time of filing and intends to remain current. *See Capital Communications Federal Credit Union v. Boodrow,* 126 F.3d 43 (2nd Cir.1997); *In re Belanger,* 962 F.2d 345 (4th Cir.1992); *Lowry Federal Credit Union v. West,* 882 F.2d 1543

indicated the Debtors would not contest the first mortgage holder's motion for relief from stay. In sum, the record does not support a finding that Debtors intended to reaffirm the recourse and nonrecourse debts with both the first and second mortgage holders. The amended Statement of Intention is not credible.

■ Even if the Court had been able to accept the amended statement of intention at face value, the treatment of the two mortgages in a hypothetical Chapter 13 setting would have required further analysis. Clearly, whether the first mortgage holder was fully secured or undersecured, that creditor would be entitled to receive full payment of its claim pursuant to 11 U.S.C. section 1322(b)(2).[21] That is, a debtor may not "strip down" a partially secured claim to the value of the collateral securing the claim. *See Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). Likewise, if the second mortgage holder was partially secured by just one cent, it would be entitled to the same treatment. That, in turn, would mean dollars devoted to monthly payments on those two debts would not be available as disposable income for unsecured creditors.

If, however, the second mortgage holder missed being partially secured by even one cent, it would not be entitled to treatment as a secured creditor under one line of circuit cases that refuses to extend the section 1322(b)(2) anti-modification clause to wholly unsecured creditors. *See In re Tanner*, 217 F.3d 1357 (11th Cir.2000); *Bartee v. Tara Colony Homeowners Ass'n, (In re Bartee)*, 212 F.3d 277 (5th Cir.2000); *In re McDonald*, 205 F.3d 606 (3rd Cir. 2000). The second mortgage holder's seemingly valueless-of-the-moment lien would be entitled to such protection in certain trial courts that extend the *Nobelman* analysis from a "strip down" fact pattern to a "strip off" scenario. *See In re Lane*, 248 B.R. 534 (Bankr.E.D.Tenn. 2000); *In re Enriquez*, 244 B.R. 156 (Bankr.S.D.Cal.2000); *In re Virello*, 236 B.R. 199 (Bankr.D.S.C.1999). Assuming this Court agreed with the latter line of decisions,[22] the ultimate result would be the same as discussed in the preceding paragraph. Assuming this Court agreed with the existing circuit authority,[23] dollars devoted to the monthly payment on the second mortgage would be available as disposable income for unsecured creditors.

(10th Cir.1989). Others require reaffirmation. *See Matter of Johnson*, 89 F.3d 249 (5th Cir.1996); *In re Taylor*, 3 F.3d 1512 (11th Cir.1993); *Matter of Edwards*, 901 F.2d 1383 (7th Cir.1990). The Court of Appeals for the Eighth Circuit has not yet addressed the "ride-through" issue.

21. 11 U.S.C. section 1322(b) provides:

Subject to subsections (a) and (c) of this section, the plan may—

. . . .

(2) modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence*, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; 11 U.S.C. § 1322(b) (emphasis added).

22. It should be noted that at least three judges of the Court of Appeals for the Eleventh Circuit did not agree with the *Tanner* decision cited in the text. *See In re Dickerson*, 222 F.3d 924 (11th Cir.2000) (holding that the Chapter 13 debtor would not have been permitted to strip off the wholly unsecured lien were the appellate panel not bound by prior precedent).

23. As of this date, the Court of Appeals for the Eighth Circuit has not ruled on the "strip off" issue. Parenthetically, this Court points out that the Eighth Circuit has determined that a Chapter 12 debtor may "strip down" a partially secured claim. *Harmon v. U.S. Through Farmers Home Administration*, 101 F.3d 574 (8th Cir.1996). 11 U.S.C. section 1222(b), however, does not contain the anti-modification clause found in section 1322(b).

The claim of the second mortgage holder would be added to the rest of the unsecured debt when calculating the percentage distribution to unsecured creditors in the hypothetical Chapter 13 context.[24]

■ *Telephone.* The U.S. Trustee recommends $75.00. The Debtors request $140.00.

During direct examination, Mr. Vandenberg testified that the recommendation reflected a flat figure. On redirect, he explained his holistic approach to adjustments when faced with lower dollar amount requests for this line item:

> Typically, I think I might raise it; or if it's close, I'll allow it, if I think other— you know, maybe the cable or something else is higher, and the telephone is less. I won't mess with them. But I'll try to get to an allowance where I'm giving, you know, comparable amounts. If their telephone happens to be a little lower, maybe something else is a little higher, and I'll go that way. Rather than fiddle with every figure, I'll look at the whole expense allocations and see what's high here, and does it balance out somewhere else.

(Tr. 18, ¶ 16—Tr. 19, ¶ 1.) He applied the same general rationale and method to higher dollar amount requests. He acknowledged seeing higher requests when a phone is utilized for business or employment.

Mr. Woodward testified that the $140.00 request covers the home phone and the Debtors' cell phones. He stated he uses his cell phone in his business, both for emergencies and to make appointments. He pays $19.95 per month, plus tax and an occasional minor fee if he runs over the 45–minute limit. However, his testimony suggested that he also makes long distance business calls using the home phone every day.

The record is devoid of any documentation to clarify and to support the Debtors' request. Nevertheless, Mr. Vandenberg agreed that requests above the standard recommendation are not unusual when a phone is utilized for work. Accordingly, the Court will allow a telephone expense of $100.00.

■ *Cable/Satellite.* The U.S. Trustee recommends $25.00. The Debtors request $55.00.

Mr. Vandenberg testified that the recommendation was for a basic cable package. Any increased allowance for premium service should come out of another budget category, like recreation.

Mr. Woodward testified the Debtors purchased a small satellite dish because they could not obtain cable service at their rural address. He explained he signed up for a two-year premium package because the cost of the dish and installation would be refunded under that option. He stated the monthly fee is the amount requested.

The Debtors, however, did not provide any documentation to support their request. Additionally, the record does not indicate when the purchase was made, when the two year package would run out

---

**24.** Though the Court must analyze a section 707(b) motion vis-à-vis a hypothetical Chapter 13 case in order to determine a debtor's ability to pay, the section 1322(b) discussion in the context of this case necessarily raises at least the specter of substantial abuse vis-à-vis a hypothetical Chapter 20. *See generally In re Fitzmaurice,* 248 B.R. 356 (Bankr.W.D.Mo. 2000) (noting that *Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903(1992) held that a Chapter 7 debtor may not utilize 11 U.S.C. section 506(d) by itself to "strip down" an undersecured claim to the value of the collateral, and ultimately concluding that a Chapter 7 debtor may not utilize section 506(d) by itself to "strip off" a wholly unsecured claim).

or, most importantly, what the basic package would cost. Accordingly, the Court will allow a monthly satellite expense of $25.00.

*Home Maintenance.* The U.S. Trustee recommends $25.00. The Debtors request $100.00.

The recommendation mirrors the Debtors' original request. The Debtors offered no testimony or documentation to explain the reason they increased their request by $75.00. Accordingly, the Court will allow a home maintenance expense of $25.00.

*Clothing.* The U.S. Trustee recommends $50.00. The Debtors request $125.00.

Once again, the recommendation mirrors the Debtors' original request. Mr. Woodward testified that the Debtors increased this expense item by $75.00 after they put more thought into how much they spend on their respective wardrobes. He did not indicate that their new estimate was based on a review of records, receipts or advertised prices. The Debtors did not provide any documentation in support of their request. Accordingly, the Court will allow a clothing expense of $50.00.

*Transportation.* The U.S. Trustee recommends $150.00. The Debtors request $650.00.

On direct examination, Mr. Vandenberg testified that this allowance was another baseline amount that took into consideration a reasonable commuting distance to work. On cross-examination, he equated the reasonable distance as being typically between 20 and 30 miles. He indicated any expense for business-related travel that was otherwise reimbursed by one's employer would not be included in a transportation allowance.

Mr. Woodward testified that his wife travels 50 miles roundtrip for work during the school year. He travels "in excess of fifty to fifty-five thousand miles a year" as a salesman. (Tr. 32, ¶¶ 23–24.) He receives approximately $113.00 per actual work week to cover various business related expenses. He stated that virtually all of those monies defray other costs he incurs entertaining customers.

Mr. Woodward stated the Debtors increased this line item from $350.00 at the time of filing to $650.00 prior to the evidentiary hearing because the cost of gasoline had increased from a low of about $1.15 per gallon to a high of around $1.80 per gallon during that time frame. He noted that the price of gasoline was at $1.529 per gallon in his home town on the date of the hearing. Mr. Woodward also testified that the increased request was based, in part, on Debtors' recent bills.

Debtors' Exhibit 4 is a monthly statement for Mr. Woodward's Texaco credit card account and reflects charges made on two cards held under that account. The closing date was August 23, 2000. The statement indicates a zero previous balance and a new balance of $622.60. The balance includes one $17.90 fuel charge incurred in Iowa, a $452.66 charge to replace a power steering system, and six fuel charges incurred in South Carolina and Georgia. Mr. Woodward reported that the latter charges related to a family vacation and that the Debtors took two vehicles on that trip.[25]

---

**25.** According to Schedule B (Personal Property) the Debtors had five vehicles prior to filing this case: a 1985 Ford Truck; a 1994 Tempo; a 1995 Mitsubishi Eclipse that was repossessed; a 1996 Lumina Van that was repossessed; and a 1998 Chevy Blazer. On Sched-

ule C (Property Claimed As Exempt), Mr. Woodward claimed the 1985 vehicle exempt. On both their original and amended Statements of Intention, the Debtors indicated they would be reaffirming the debts on the 1994 Tempo and the 1998 Blazer. The did so prior

Debtors' Exhibit 5 is a portion of a monthly statement for Mr. Woodward's Amoco credit card account. The statement indicates a balance of $525.99 and a payment due date of July 9, 2000. The exhibit does not contain any itemization. Debtors' Exhibit 6 is a monthly statement for another Amoco credit card account in Mr. Woodward's name and reflects charges made on three cards held under that account. The statement date was August 11, 2000. The exhibit shows a previous two-month balance of $1,022.92, that was paid in full, and a new balance of $364.97. The balance includes a number of food and beverage charges that total $27.62, two vacation refueling charges that total $30.02, and three charges that total $44.51 and relate to family visits within the state of Iowa. The remaining $258.82 in fuel charges are attributable to Mr. Woodward's work. Exhibit 6 reveals that the price per gallon of unleaded regular gasoline at the Iowa stations Debtors frequented fluctuated between $1.33 and $1.58 for the billing period.

Despite the amount of testimony and the documentary evidence, the record before the Court is less than clear when it comes to analyzing what transportation amount is reasonably necessary in this case. While the U.S. Trustee's recommendation is in keeping with the amounts allowed by the Court in prior cases, it is indeed just a baseline amount meant to cover the cost of fuel and maintenance. Fuel prices increased after the date this case was commenced but it is far from certain that the price level at the time of the hearing will continue for the next three to five years.

With respect to just work related travel, the Court would not be able to compare the U.S. Trustee's suggested reasonable commuting distance with the work miles driven by the Debtors because Mr. Van-

denberg did not state whether that distance was one-way or roundtrip—for one or both Debtors. Mr. Woodward, on the other hand, only told the court that his wife travels 50 mile roundtrip during the school year. He did not specify how long the school year runs or if his wife is required to make such journeys during any portion of various school breaks. While his estimate regarding the annual amount of his business travel is divisible by 12 months and Exhibit 6 does contain some information about the use of one credit card for fuel for work related travel after the price of gasoline increased, the issue of reimbursement remains. That is, the Court did not find Mr. Woodward's testimony about the utilization of most of the additional $113.00 for non-fuel items convincing or compelling. Lastly, the record contains no information about the miles per gallon that the Debtors' vehicles average.

Though the Court is left with the distinct impression the U.S. Trustee's recommendation is too low in this particular case, the Court is unable to find that the full amount originally requested by the Debtors is reasonably necessary. Mr. Woodward's monthly work related fuel costs should be somewhere in the $150.00 range. The record does not support finding that more than a similar monthly amount is reasonably necessary to cover collectively Mrs. Woodward's work related travel, a limited amount of personal travel, and occasional maintenance on two vehicles. Accordingly, the Court will allow $300.00 to cover the Debtors' various transportation costs.

*Recreation.* The U.S. Trustee recommends $25.00. The Debtors request $50.00.

to the evidentiary hearing on the section 707(b) motion.

The recommendation mirrors the Debtors' original request. The Debtors offered no testimony or documentation to explain the reason they increased their request by $25.00. The Court will allow a recreation expense of $25.00.

*Home Insurance.* The U.S. Trustee recommends nothing be allowed for this line item. The Debtors request $50.00.

Mr. Vandenberg testified that the U.S. Trustee's recommendation was based mainly on evidence that the requested auto insurance amount included home insurance. Mr. Woodward testified that Debtors' Exhibit 7 was a billing account notice from EMC Insurance Companies for Debtors' automobile and homeowners coverage. The exhibit indicates the six month premium for the latter is $276.51 and the minimum monthly amount due is $46.09. The six month premium for the automobile insurance is $579.15 and the minimum monthly amount due is $96.53. There is one three dollar transaction charge that covers both policies. Therefore, the Court will allow $46.09 plus half the transaction charge for home insurance. That amount is $47.59. In turn, the Court will adjust the amounts recommended and requested for automobile insurance downward to $96.53 plus half the transaction charge. That amount is $98.03.

*Life Insurance.* The U.S. Trustee recommends nothing be allowed for this line item. The Debtors request $60.86.

On cross-examination, Mr. Vandenberg observed that the Debtors had failed to provide any documentation regarding the life insurance in their budget. He explained that universal life insurance is typically disallowed as a savings feature and term insurance is typically disallowed when both debtors are employed and have no dependents. In response to questioning regarding what would happen if Mr. Woodward died, Mr. Vandenberg pointed out that the monthly expenses for the remaining Debtor would be significantly reduced even though the total might remain slightly higher than the monthly income of the surviving spouse.

Mr. Woodward testified that he pays $60.86 a month for a $200,000.00 term life insurance policy. His reason for this request was:

> Well, in three weeks I'll be married 36 years, and I owe my wife for those years. Also, when we brought our house, they wanted us to buy private mortgage insurance, which was much more than that, and I said I would get a life insurance policy to cover that amount so my wife would have a home.

(Tr. 73, ¶¶ 15–21.)

Mr. Woodward also testified he used $5,000.00 of the $8,500.00 in tax refunds that the Debtors received in early 2000 to purchase a $25,000 whole life insurance policy. Though the policy's immediate cash value is around $4,000.00 and though the policy will provide a return at a given age, Mr. Woodward seemingly disputed that it was an investment vehicle. Rather, he considered the policy to be a death benefit that would enable his wife to keep their home in the event of his early demise. He pointed out that the term insurance ran out at age 72.

The record indicates Mr. Woodward's wife is employed and should have the ability to support herself in the event he should die. Moreover, the Debtors' prepetition planning included obtaining a $25,000.00 whole life policy that could be utilized in the event of Mr. Woodward's death. Therefore, the Court finds carrying term life insurance is not a reasonable expense in this case.

*Student Loan.* The U.S. Trustee recommends no allowance. The Debtors request $70.74.

Mr. Vandenberg testified that the student loan was omitted from the budget because it would be treated as an unsecured debt for the purpose of the hypothetical Chapter 13 analysis. Apparently responding to the U.S. Trustee's earlier written concern about the obligation being the primary responsibility of the Debtors' son, Mr. Woodward testified this line item expense related to his wife's guaranteed student loan that she obtained about seven years ago.[26] He did not provide any other information about the balance owing on the loan or the terms of repayment.

Since the unsecured debts that would be paid under a hypothetical Chapter 13 would include any unsecured student loan obligation, the Court will not allow any amount for this item in the monthly budget.

■ *Personal.* The U.S. Trustee recommends $100.00. The Debtors make no claim under this category.

Mr. Vandenberg testified this catchall category covers incidental items that debtors sometimes overlook in budget preparation. Based on numerous 707(b) motions the U.S. Trustee has argued and the Court has heard in this district, the Court realizes the personal expense category also serves as a slight cushion in the U.S. Trustee's holistic approach in these matters. Certainly, in this case, the extra $100.00 a month would cover or lessen the difference between a number of the recommendations and requests. Accordingly, the Court will allow $100.00 for the personal expense item.

### Monthly Balance

The sum of the allowed monthly expenses is $2,899.00. Subtracting that amount from the net monthly income figure of $4,650.00 yields monthly disposable income of $1,751.00.

## II. The Substantial Abuse Analysis.

■ Based on the above calculations, the Debtors will likely have between $63,036.00 and $105,060.00 disposable income over the next three to five years.[27] Though the U.S. Trustee's repayment capacity analysis set forth on Exhibit B simply divides the respective disposable income figures by $76,401.00—the rounded off amount of scheduled unsecured debt,[28] the Court finds that analysis is incomplete under the facts of this particular case. That is, the unsecured debts would include any debt remaining after surrender of the homestead. According to the information the Debtors' provided at the time of filing, the first mortgage holder was undersecured and the second mortgage holder was unsecured. The recourse mortgage debt amounted to approximately $61,482.00.[29] Moreover, these Debtors listed the following debts secured by collateral that they

---

**26.** Contrary to Mr. Woodward's testimony, Schedule F (Creditors Holding Unsecured Nonpriority Claims) appears to include only one debt related to student loans and the information contained therein suggests that Mr. Woodward cosigned a consolidation loan for his son in September 1994. The amount of the debt is set forth as "Unknown."

**27.** $1,751.00 × 36 = $63,036.00 and $1,751.00 × 60 = $105,060.00.

**28.** *See supra* note 26. Since the Debtors have failed to clarify the amount of the student

loan obligation and given the inconsistency between their verified written statement on Schedule F and Mr. Woodward's testimony under oath, the Court finds it inappropriate to add any amount to the scheduled unsecured debt total found on Schedule F.

**29.** *See supra* note 16. For the purpose of this analysis, the Court is accepting the homestead value the Debtors set forth on Schedules A and D.

intended to surrender: 1995 Mitsubishi ($11,000.00 claim / $6,500.00 unsecured portion); 1996 Lumina Van ($13,045.02 claim / $8,045.02 unsecured portion); and Condo Time Share ($18,000.00 claim / $17,000 unsecured portion).[30] The unsecured portions at the time of filing amounted to a rounded figure of $31,545.00. Hence the appropriate amount of unsecured debt under consideration in a hypothetical Chapter 13 case would be $169,428.00, meaning the Debtors' projected disposable income would satisfy 37.2% of their unsecured debt in a three year plan and 62% of that debt in a five year plan.[31]

Given the significant amount of disposable income and given all the discussed nuances of this case, allowing the Debtors to retain their disposable income in lieu of paying their unsecured debts would amount to a substantial abuse of the Chapter 7 provisions.

## CONCLUSION

WHEREFORE, the Court concludes the U.S. Trustee has overcome the statutory presumption in favor of granting Chapter 7 relief and the motion to dismiss must be granted.

A separate Order shall be entered accordingly.

**MONTHLY EXPENSES (In Whole Dollars)**

| ITEM | SCHEDULE J | EXHIBIT B | AMENDED J | ALLOWED |
|---|---|---|---|---|
| Home Mortgage | 789 | 900 | 789 | 900 |
| Electricity | 190 | 190 | 190 | 190 |
| Water/Sewer | 30 | 30 | 30 | 30 |
| Telephone | 140 | 75 | 140 | 100 |
| Cable/Satellite | 55 | 25 | 55 | 25 |
| Home Maintenance | 25 | 25 | 100 | 25 |
| Food | 250 | 300 | 300 | 300 |
| Clothing | 50 | 50 | 125 | 50 |
| Laundry/ Dry cleaning | 25 | 25 | 25 | 25 |
| Medical | 30 | 30 | 30 | 30 |
| Transportation | 350 | 150 | 650 | 300 |
| Recreation | 25 | 25 | 50 | 25 |
| Charitable Contributions | 25 | 25 | 25 | 25 |
| Home Insurance | 50 | 0 | 50 | 48 |
| Life Insurance | 61 | 0 | 61 | 0 |

**30.** Since payment of the debts owed on the Tempo and Blazer are covered in the allowed expenses, the Court will not include what might have been an unsecured amount in a hypothetical Chapter 13. The Court points out, however, that the Debtors listed the claim against the Tempo as being $4,131.00. The unsecured portion was $1,631.00. They reaffirmed the debt in an amount of $3,277.44. The Debtors listed the claim against the Blazer as being $20,318.57. The unsecured portion was $5,318.57. They reaffirmed the debt in an amount of $18,943.07.

**31.** [$63,036.00 × 100] ÷ $169,428.00 = 37.20% and [$105,060.00 × 100] ÷ $169,428.00 = 62.00%. Parenthetically, the Court points out these calculations do not take into account either the trustee's commission and the attorney's fee in a Chapter 13 context or the accrual of interest under a repayment plan outside of bankruptcy.