| ITEM | SCHEDULE J | EXHIBIT B | AMENDED J | ALLOWED |
|---|---|---|---|---|
| Health Insurance | 204 | 0 | 0 | 0 |
| Auto Insurance | 140 | 140 | 140 | 98 |
| Property Taxes | 200 | 0 | 200 | 0 |
| Tempo Installments | 154 | 154 | 154 | 154 |
| Blazer Installments | 474 | 474 | 474 | 474 |
| Student Loan | 71 | 0 | 71 | 0 |
| Second Mortgage | 865 | 0 | 865 | 0 |
| Personal | 0 | 100 | 0 | 100 |
| **TOTAL** | 4202 | 2718 | 4523 | 2899 |

**In the Matter of Raymond Paul DeROSEAR, Paula Joyce DeRosear, Debtors.**

**No. 00–01959–DJ.**

United States Bankruptcy Court, S.D. Iowa.

July 20, 2001.

Steven R. Hahn, Burlington, Iowa, for debtors.

Burton H. Fagan, Bettendorf, Iowa, Chapter 7 Trustee.

Barbara G. Stuart, United States Trustee, by James L. Snyder, Assistant U.S. Trustee, Des Moines, Iowa, for Region 12.

## MEMORANDUM OF DECISION

LEE M. JACKWIG, Bankruptcy Judge.

Barbara G. Stuart, the United States Trustee for Region 12 ("U.S. Trustee"), filed an 11 U.S.C. section 707(b) motion to dismiss this Chapter 7 case. She contends permitting Debtors Raymond Paul and Paula Joyce DeRosear ("Debtors") to proceed with this liquidation case would be a substantial abuse of the provisions governing Chapter 7 because the Debtors have the ability to pay a significant percentage of their consumer debt. The Debtors disagree. Having conducted an evidentiary hearing on the controversy and having reviewed the record and the arguments of the parties, the Court now enters its decision.

The Court has jurisdiction of this matter pursuant to 28 U.S.C. section 1334 and the standing order of reference entered by the District Court for the Southern District of Iowa. This is a core matter under 28 U.S.C. section 157(b)(2)(A) and (O).

## BACKGROUND

On May 30, 2000 the Debtors filed a petition for relief under Chapter 7 of the United States Bankruptcy Code. On the same date they filed their Schedules and Statement of Financial Affairs. On Sched-

ule D (Creditors Holding Secured Claims), the Debtors indicated they owed $155,500.00 in secured debt. On Schedule E (Creditors Holding Unsecured Priority Claims), they reported they owed nothing in unsecured priority debt. On Schedule F (Creditors Holding Unsecured Nonpriority Claims), they listed $43,300.00 in unsecured nonpriority debt.[1]

On Schedule I (Current Income of Individual Debtors), the Debtors reported that 51 year old Mr. DeRosear has been employed as a college instructor with Southeastern Community College for 23 years and 50 year old Mrs. DeRosear has been employed as a maintenance worker with the Iowa Department of Human Services for 11 years. His monthly gross income was $3,792.00 and hers was $2,492.00. After all payroll deductions were taken into account, his net monthly take home pay was $2,720.00 and hers was $1,773.00. His income was further adjusted downward to $1,683.00 because he had $1,037.00 negative monthly income related to the operation of a business or profession or farm.[2]

Hence, the Debtors' combined net monthly income was $3,456.00. They listed no dependents. On Schedule J (Current Expenditures of Individual Debtors), the Debtors indicated their monthly expenses totaled $5,139.49. That figure included payments on all but one of their secured debts.[3]

On August 25, 2000 the U.S. Trustee filed the pending motion to dismiss. As for Mr. DeRosear's monthly income, she advocated discontinuing the business that was generating monthly business losses. Accordingly, she added $1,037.00 back to his net monthly income. As for the Debtors' monthly expenses that exceeded the standard or benchmark allowances in this district, the U.S. Trustee made certain adjustments. Specifically, she reduced the amounts shown on Schedule J for telephone, cable, home maintenance, clothing, medical, transportation, recreation and two auto installments. She also eliminated life insurance and special health insurance premiums and the installment payment on a riding mower.

---

1. The parties do not dispute the Debtors' various debts are primarily consumer debts.

2. Contrary to the requirement set forth on the Schedule I form, the Debtors did not attach any detailed statement to explain this adjustment. Additionally, though Debtors responded to Paragraph 1 (Income from employment or operation of business) of their Statement of Financial Affairs by referring the reader to attached Tax Schedule C for 1998 and Tax Schedule C for 1999, they failed to include such documents with their petition, schedules and statement of financial affairs. The Court brought those omissions to the attention of the Debtors and Debtors' attorney at the evidentiary hearing on the motion and gave them two weeks to submit the missing documents. To date, they have not complied with the Court's directive.

3. On Schedule D (Creditors Holding Secured Claims), the Debtors reported they owed GreenPoint Credit $43,000.00 and indicated the collateral securing the debt was worth $40,000.00. On June 23, 2000 Greentree

Credit Corp. filed a motion for relief from the automatic stay in order to enforce the April 26, 2000 replevin judgment it was granted in a Wisconsin state court. The creditor alleged that the Debtors owed it $39,894.38, plus interest, and that the debt was secured by a 1997 Artcraft Mobile Home in which the Debtors had no equity. The Debtors did not contest the motion for relief from stay. On July 10, 2000 the Court entered an order granting the motion. On cross-examination, Mrs. DeRosear testified:

> That was a mortgage for a mobile home that our daughter, who's now going through the divorce, the one with the van—
> She and her husband moved to Menominee, Wisconsin, with his job. They needed a cosigner for their mobile home, and we agreed to do that. And then they split up and the mobile—they reneged on the mortgage, and Greenpoint came back after us, and here we are.

(Tr. 53, ¶¶ 14–22.)

According to the U.S. Trustee's adjusted calculations, the Debtors' combined net monthly income was $4,493.00 and their monthly expenses totaled $3,140.00. She contended the resulting disposable monthly income of $1,353.00 would pay off 112.49% of Debtors' unsecured nonpriority debts in three years and 187.48% in five years.

The Clerk of Court scheduled the preliminary telephonic hearing on the controversy for September 19, 2000. Debtors' attorney was unable to participate in the hearing for reasons beyond his control. In an order entered on September 19, 2000, the Court continued the matter to October 30, 2000 but directed the Debtors to file their written objection, if any, to the section 707(b) motion and to provide the U.S. Trustee with all relevant and material documentation by October 17, 2000.

On October 20, 2000 the Debtors filed their objection to the U.S. Trustee's motion. With respect to the challenged expenses, they only agreed with the reduction in the amount allowed for cable services. As reflected by the attached chart, they left the amounts in twelve categories unchanged and increased the amounts in 8 others.[4] With respect to the latter, they changed telephone from $100.00 to $104.00, home maintenance from $150.00 to $178.00, clothing from $150.00 to $200.00, medical from $175.00 to $226.00, transportation from $400.00 to $997.00, recreation from $250.00 to $269.00, and personal from $0.00 to $95.00. These various adjustments increased the Debtors' monthly expenses to $5,937.00.

During the October 30, 2000 preliminary hearing, Debtors' attorney argued that eliminating the tax write offs related to the business losses would result in the Debtors paying between $300.00 and $400.00 more in income taxes. The U.S. Trustee's attorney responded that the U.S. Trustee's calculation of income took into account the maximum taxable events available to the Debtors. At the conclusion of the hearing, the Court entered an order setting certain deadlines and scheduling the matter for an evidentiary hearing on December 20, 2000.[5]

On November 24, 2000 the Debtors filed a document captioned "Amendment To Petition," to which they attached an exhibit that stated:

The debtors hereby amend their Schedule J to include the following:

A. Those items set forth in the Resistance to Motion to Dismiss filed herein on October 2[sic], 2000.

The debtors further indicate that they have the following expenses or changes in expenses forthcoming.

A. Their home insurance is now going to be $54.08 per month.

B. Mrs. DeRosear contributes the sum of $49.94 bi-weekly to her IPERS program and Mr. DeRosear contributes the sum of $69.47 twice a month to his mandatory retirement plan.

C. The health insurance of $72.13 presently coming out of each check of

---

**4.** The Debtors actually increased the amount requested for home insurance from $50.00 to $54.00 in a document they filed on November 24, 2000.

**5.** Most notably, in light of the October 20, 2000 objection signed by Debtors' attorney, the Court afforded the Debtors an opportunity to amend their Schedules by November 22, 2000 to reflect as accurately as possible their financial situation as of the petition date. *See Matter of Woodward,* 265 B.R. 179, 183 n. 6 (Bankr.S.D.Iowa 2001) (discussing this Court's policy on amendments and affidavits in the wake of a section 707(b) motion.)

Mrs. DeRosear will increase shortly to an unknown amount, which will be at least $112.00 per payment.

 D. Mr. DeRosear will be required to incur expenses for education certification. He has 30 hours left to complete in a two year period. At the present time, he is planning to enroll to take a course at the community college in West Burlington, at a rate of $100 per credit hour and will be taking two or three hours on a regular basis throughout the year, for programs offered through the University of Iowa and University of Northern Iowa. Not only will he incur the expense of the cost of tuition and books, but he will also have an 80–mile round trip for this class.

(Amend. Pet. at 3.) [6]

On December 18, 2000 the Debtors requested a continuance of the December 20, 2000 evidentiary hearing for reasons beyond their control. The U.S. Trustee did not contest the continuance.

The Court conducted the evidentiary hearing on February 2, 2001. The U.S. Trustee relied on Exhibits A (Calculation of Income) and B (Monthly Expenses, Disposable Monthly Income, and Repayment Capacity) that were attached to her motion to dismiss. The Debtors offered no exhibits. The U.S. Trustee called one witness: Louis Todd Vandenberg, who has been the U.S. Trustee's Bankruptcy Analyst for the Southern District of Iowa for approximately ten years. The Debtors testified in their case-in-chief.

At the conclusion of the Debtors' testimony, the U.S. Trustee recalled Mr. Vandenberg for the purpose of recalculating disposable income and dividend distribu-

tion to unsecured creditors. That is, based on the Debtors' statements under oath, the U.S. Trustee acquiesced to their amended request for $226.00 per month for medical expenses and increased the amount recommended for transportation from $150.00 per month to $225.00 per month. As a result of those two adjustments, Mr. Vandenberg testified the Debtors would have $1,152.00 disposable income per month and, therefore, would still be able to pay off 96% of their unsecured nonpriority debts in three years and 160% in five years.

## APPLICABLE LAW

 11 U.S.C. section 707(b) provides in relevant part:

> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

11 U.S.C. section 707(b). The Eighth Circuit substantial abuse inquiry focuses primarily on an individual debtor's ability to pay his or her debts. *See In re Koch*, 109 F.3d 1285, 1288 (8th Cir.1997); *U.S. Trustee v. Harris*, 960 F.2d 74, 77 (8th Cir. 1992); *Fonder v. United States*, 974 F.2d 996, 999 (8th Cir.1992); *In re Walton*, 866 F.2d 981, 984–85 (8th Cir.1989). The ability to pay is typically measured by assessing how much disposable income a debtor

---

**6.** The Debtors signed a verification that the information was true and correct. The filing, however, did not meet the expectations of the Court. The Debtors should have utilized the official form for Schedule J. Moreover, Para-

graphs B and C of the exhibit attached to the "Amendment To Petition" amount to adjustments to income that should have been set forth on the official form for Schedule I.

would be able to pay his or her unsecured creditors under a three to five year Chapter 13 plan. *See Koch*, 109 F.3d at 1288. 11 U.S.C. section 1325(b)(2) defines "disposable income" as follows:

"disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor . . . and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(2). The controlling circuit case law does not require a trial court to find a debtor can pay a specific threshold of unsecured debt over three to five years before that court may conclude the Chapter 7 filing amounts to substantial abuse. Rather, "the essential inquiry remains whether the debtor's ability to repay creditors with future income is sufficient to make the Chapter 7 liquidating bankruptcy a substantial abuse of the Code." *Fonder*, 974 F.2d at 999.

▆▆▆▆ Finally, neither section 707(b) nor its legislative history suggest Federal Rule of Evidence 301 would not apply in this case.[7] Accordingly, a U.S. Trustee has the burden of rebutting or meeting the section's presumption in favor of a debtor. Nevertheless, a debtor must file a schedule of current income and current expenditures in support of the Chapter 7 petition. 11 U.S.C. § 521(1). Those schedules must be accurate. Fed.R.Bankr.P. 1008.[8]

## DISCUSSION

Resolution of the pending controversy first requires the Court to determine how much disposable income the Debtors will likely have in the next three to five years. Then the Court must decide whether allowing the Debtors to retain that amount in lieu of paying their unsecured debts is a substantial abuse of the Chapter 7 provisions.

### I. The Disposable Income Calculation.

The parties dispute both the amount of the Debtors' monthly income and whether certain of the Debtors' expenses are accurate and reasonable.

#### Monthly Income

The U.S. Trustee relies on the calculations set forth on Exhibit A. The Debtors rely on Schedule I and presumably on Paragraphs B and C in the exhibit attached to the document they filed on November 24, 2000.

▆▆▆▆ The only adjustment the U.S. Trustee made to Schedule I, that indicated the Debtors' combined monthly income was $3,456.00, was to add back the $1,037.00 amount Mr. DeRosear deducted for losses generated from his consulting business. On direct examination, Mr. DeRosear testified he had a consulting

---

7. Federal Rule of Evidence 301, made applicable to bankruptcy cases and proceedings by Federal Rule of Bankruptcy Procedure 9017, provides:

In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof

in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast. Fed.R.Evid. 301.

8. Federal Rule of Bankruptcy Procedure 1008 provides that "[a]ll petitions, lists, schedules, statements and amendments thereto shall be verified or contain an unsworn declaration as provided in 28 U.S.C. § 1746."

business before he started teaching. He began to wrap up those jobs after he accepted the teaching position. On cross-examination, he stated he began teaching three years ago.[9] He acknowledged that he no longer did any consulting work and, more importantly, that he no longer incurred the losses reflected on Schedule I.[10] He did not testify regarding what impact, if any, that adjustment has had or would have on the Debtors' tax liability. Accordingly, the Court finds the U.S. Trustee's adjustment is proper.

■ With respect to Paragraph B in the exhibit attached to their "Amendment To Petition," neither Debtor presented any testimony. They offered no documentation to verify the nature of their retirement plans and the actual amounts they contribute to those plans. Accordingly, the Court will not adjust the Debtors' monthly income downward to take into account those alleged payroll deductions.

With respect to Paragraph C in the exhibit attached to their "Amendment to Petition," Mrs. DeRosear testified on direct examination that her employer pays her health insurance but deducts approximately $116.00 from her bi-weekly paychecks for coverage for her husband. The U.S. Trustee's income calculation included a $184.00 insurance deduction from Mrs. DeRosear's monthly gross income.[11] That calculation seemingly falls short by $67.00.[12]

Even though the Debtors did not offer a copy of Mrs. DeRosear's most recent paycheck into evidence, the U.S. Trustee did not cross-examine her about the alleged increase and did not challenge her representation in closing argument. Accordingly, the Court will allow the adjustment.

Therefore, based on the two adjustments, the Court finds the Debtors' combined net monthly income is $4,426.00.[13]

### Monthly Expenses

■ *Telephone.* The U.S. Trustee recommends $75.00. The Debtors request $104.00.

In their October 20, 2000 written objection to the motion, the Debtors set forth the following explanation for this requested amount:

> At the present time, the Debtors have basic service in the amount of $26.00. Their long distance calls are $50 or more every month. These are caused by connections with relatives. The parents of Mrs. DeRosear are in a care center in Sioux City, Iowa, and the parties have a daughter in Texas with health problems.

9. The record does not explain the discrepancy between his testimony and the representation on Schedule I that he had been teaching for 23 years.

10. The record does not explain exactly when Mr. DeRosear completed the last consulting job. Even if that occurred the month the Debtors filed their bankruptcy petition, the Debtors should have amended Schedule I or filed an affidavit about their change in income at some point well in advance of the continued evidentiary hearing—if not well in advance of the continued preliminary hearing, at which Debtors' attorney represented to the Court that Mr. DeRosear continued to do consulting work.

11. The amount is the same as that appearing on Schedule I. The record does not explain why the Debtors otherwise represented in Paragraph C of the exhibit attached to their "Amendment To Petition" that Mrs. DeRosear had been paying in essence $156.28 a month for health insurance. [$72.13 × 26 = $1,875.38 ÷ 12 = (rounded off to whole dollars) $156.28.]

12. $116.00 × 26 = $3,016.00 ÷ 12 = $251.33 − $184.00 = (rounded off to whole dollars) $67.00.

13. $3,456.00 + $1,037.00 = $4,493.00 − $67.00 = $4,426.00.

The final sum of $28.00 is incurred on a regular basis for a cell phone which is required for Mr. DeRosear's job due to the fact that he is on the road a great deal of time. The total which should therefore be allowed is $104.00.

(Attach. at 1.)

On cross-examination, Mr. DeRosear explained that he teaches a construction technologies program that requires him to keep in contact with student interns on job sites. On direct examination, Mrs. DeRosear testified that she regularly calls both nursing home staff and her mother due to her mother's poor health.[14] She also reported that the Debtors place a call at least once a week to one of their daughters who is going through a divorce and who has health problems. That daughter lives in Texas. On cross-examination, she acknowledged that sometimes the daughter calls the Debtors.

The record is devoid of any documentation to support the Debtors' request. Nevertheless, the Court has approved an allowance above the standard recommendation without documentation when the record otherwise establishes that a phone is utilized for work. *See Matter of Woodward*, 265 B.R. 179, 190 (Bankr.S.D.Iowa 2001). Given Mrs. DeRosear's otherwise credible testimony about her mother and daughter, some additional amount for long distance calls appears to be warranted. Accordingly, the Court will allow a telephone expense of $100.00.

■ *Home Maintenance.* The U.S. Trustee recommends $100.00. The Debtors request $178.25.

In their October 20, 2000 written objection to the motion, the Debtors set forth the following explanation for this requested amount:

Analyzing the actual expenses of the last year, the debtors have found that these expenses should actually be increased to $178.25.[15] These expenses include:

Cleaning supplies and vacuum supplies—$10.00

Carpet cleaner—$12.00

Siding maintenance—$24.60

Pest control—$15.00

Interior papering and painting—$10.00

Exterior trim/windows—$10.00

Deck cleaning and treatment—$10.00

Roof maintenance—$24.00

Lawn Mowing—$20.00

Driveway maintenance—$35.50

Lagoon/septic maintenance—$6.75

(Attach. at 1.)

On direct examination, Mr. DeRosear testified that he had analyzed the Debtors' home maintenance expenses for the last four years. On cross-examination, he acknowledged the $24.00 in roof maintenance was based on $5,750.00 the Debtors paid five years ago for a roof that he expected would last 20 years. As for interior painting and papering, Mr. DeRosear represented the Debtors took care of that maintenance every year and the $20.00 figure was a monthly average. He explained that the amount requested for lawn mowing included fuel, oil, blades and maintenance for the tractor mower that he used both for mowing the lawn and for plowing the snow. He testified the monthly allotment for the Debtors' gravel driveway covered both the annual expense of putting down one load of gravel and the ongoing costs of using vegetation killer.

---

14. The nursing home is located in northwest Iowa; the Debtors live in southeast Iowa.

15. The items actually add up to $177.85. Rounding off either figure yields $178.00.

The Debtors offered no documentation in support of their request even though Mr. DeRosear's testimony suggested the itemized amounts were based on a review of their actual expense records. Nevertheless, with the exception of the roof expense, the explanations and rationale behind the requests for the items the U.S. Trustee questioned on the record were credible and within reason. The U.S. Trustee did not specifically challenge the other items. Accordingly, the Court will allow a home maintenance expense of $154.00.[16]

■■■■ *Clothing.* The U.S. Trustee recommends $50.00. The Debtors request $200.00.

In their October 20, 2000 written objection to the motion, the Debtors set forth the following explanation for this requested amount:

The debtors have actually understated their expense for clothing. The cost of undergarments/hose, six pair of slacks/jeans, shoes, blouses and T-shirts, dresses, coat and jacket and sweater, along with gloves and mittens for the use of Mrs. DeRosear would average, on an annualized basis, over $60.00 per month. Mr. DeRosear buys eight pairs of jeans and shirts per year and wears dress slacks to work. Due to his health problems, which will be explained in the medical expense section, he must wear extremely well-constructed dress and work shoes constantly. When the cold weather arrives, he has to have heavily insulated shoes which range $220 – $225. Cold weather work clothes, which are very expensive, are required due to his health problems. Additionally, he is required to wear safety glasses, which could either be factored in here or under

medical expenses. The true clothing expense for these Debtors is probably closer to $200 per month on a literal basis. $50 a month would not even cover Mr. DeRosear's safety shoes and dress shoes which are required.

Further, it is understood that the employment of Ms. DeRosear will soon require a dress code and it is anticipated that jeans will no longer be allowed.

(Attach. at 1–2.)

On cross-examination, Mr. DeRosear reiterated that a major portion of the requested clothing allowance was related to his health condition that rendered him a "walking paraplegic" and to his employment that included work out-of-doors. Mr. DeRosear emphasized that the insulated safety shoes were an OSHA requirement, and he reported a pair lasted between two and three years. He did not state how much he pays for a pair of dress shoes or how long a pair lasts, making it impossible to understand why the Debtors boldly stated in writing that the recommended clothing allowance of $50.00 a month or $600.00 a year would not even cover the cost of Mr. DeRosear's footwear. That is, assuming that a pair of safety shoes and a pair of dress shoes each cost $225.00 and both would last only two years regardless of repair options, earmarking approximately $20.00 a month for his shoes should be more than ample.[17]

On direct examination, Mrs. DeRosear testified that she needs a clothing allowance of at least $60.00 per month or $720.00 per year because she can not wear torn, frayed or stained clothing to work. She reported she wears out approximately six pairs of jeans or dress slacks per year and one pair of shoes.

---

16. $178.00 − $24.00 = $154.00.

17. $225.00 × 2 = $450.00 ÷ 24 = $18.75.

The Debtors did not provide any documentation in support of their testimony, and their testimony failed to explain why their request deviated so much from the U.S. Trustee's recommendation. That is, the U.S. Trustee's $50.00 guideline assumes debtors have established wardrobes that require just enough funds for repair and replacement of certain items. Though the guideline may be too low in cases like this where the debtors work at jobs that entail more wear and tear on certain items of clothing and that require protective gear, no debtors should expect this Court to accept undocumented blanket assertions that they spend a given amount of money to replace their basic wardrobe every year. Additionally, while the Court is sympathetic to special needs some individuals may have as a result of health conditions, the Court expects some probative evidence that a particular condition does in fact require a special wardrobe. In this case, the Debtors provided no medical report from any of Mr. DeRosear's treating physicians. Indeed, despite the Debtors' written statement that Mr. DeRosear required special shoes due to his physical condition, his testimony did not make such a connection but rather emphasized that the work shoes had to meet government standards.

Accordingly, taking into account the nature of the Debtors' jobs and acknowledging the existence—if not the alleged full impact of Mr. DeRosear's health condition on his clothing allowance, the Court will allow a clothing expense of $100.00.

■■■■ *Transportation.* The U.S. Trustee's adjusted recommendation is $225.00. The Debtors request $997.27.

On direct examination, Mr. Vandenberg testified that the original recommendation of $150.00 was the standard amount the U.S. Trustee allowed for transportation. He acknowledged the amount could vary on occasion but noted the Debtors had not provided any documentation to support a deviation from the norm. On cross-examination, Mr. Vandenberg acknowledged that fuel prices had ranged from $1.30 to $1.60 per gallon in recent months. He explained, however, that the transportation allowance included both the cost of fuel and maintenance, and adjusting that allowance to take into account an inflationary figure for one component required more specifics about the Debtors' driving habits.

In their October 20, 2000 written objection to the motion, the Debtors set forth the following explanation for this requested amount:

> Calculated at 29 cents per mile, which is the State rate, the expenses that the DeRosears incur amount to $997.27 on a monthly basis. Ms. DeRosear has a 50 mile round trip for work, Mr. DeRosear has an 80 mile round trip, but there are extras in his case. The nearest grocery store is 15 miles away, the closest doctor is 40 miles away, and the closest mall is 80 miles away. To visit Ms. DeRosear's parents in the nursing home in Sioux City causes a mileage expense of 900+ miles. Additionally, it should be known to the court that in the last year, gasoline in the state of Iowa has risen from approximately 1.05 per gallon to approximately 152.9 at present.

(Attach. at 2–3.)

On direct examination, Mr. DeRosear testified that the Debtors' original request for $400.00 for this line item was based on a fuel price of $1.059 per gallon. By comparison, he stated he paid $1.499 per gallon for gasoline the morning of the hearing. He did not explain why less than a 42% increase in the cost of gasoline would justify almost a 150% increase in the re-

quested amount.[18] Then on cross-examination, he proceeded to verify that he calculated the transportation costs entirely on the state income tax allowance of $0.29 per mile rather than on any review of the Debtors' fuel and maintenance receipts. Mr. DeRosear's reasoning was that he had found taking the standard tax allowance more beneficial than using actual expenses when he owned his own business. Mr. DeRosear clarified that no portion of the requested amount for transportation was based on that former consulting work.

Though he confirmed the distance he travels to his place of employment, Mr. DeRosear did not clarify how many days in a year he does so. He stated he receives no reimbursement from his employer for travel to construction sites, but he did not explain whether those sites were off the beaten path or on the way to and from his official duty station. Mr. DeRosear indicated that he does receive reimbursement to attend seminars. His testimony did not address the frequency of any personal travel. He said nothing about the location of any stores or offices he visits vis-à-vis his route to and from work. (Only by reference to the Debtors' October 20, 2000 written objection to the auto installment allowance, does the Court gather that Mr. DeRosear's approximate yearly mileage for both business and personal travel might be 25,000 miles.) Last but far from least, he did not report how many miles per gallon of gasoline his 1999 Chevy pickup averages.

On direct examination, Mrs. DeRosear testified that the cost of her commute to work had increased, that the distance she travels one way is 25 miles, and that she has been unable to find any co-worker willing to carpool. Like her husband's testimony, her statements under oath addressed neither how many days in a year she travels to work nor any details about her personal travel. (Here, the Debtors' October 20, 2000 written objection to the auto installment allowance only states that her business travel amounts to 12,500 miles per year.) She too failed to report how many miles per gallon of gasoline her 1998 Grand Am averages.

Once again, the Debtors offered no documentary evidence to support the amount requested for this line item. Their testimony was not based on a review of past expenditures for fuel and maintenance but rather on the state tax allowance. At least one bankruptcy court in this circuit has published a decision criticizing that approach. *See Matter of Schmidt,* 200 B.R. 36, 39 n. 5 (Bankr.D.Neb.1996) (pointing out the debtors should have set forth their actual transportation expenses related to business rather then relying on the $0.30 per mile figure allowed by the Internal Revenue Service.) This Court agrees that a tax allowance is not a sufficient substitute for actual expenditures.

Indeed, neither Debtor testified that they actually kept track of their mileage over any given period of time. The Court cannot determine with any degree of certainty whether the mileage number, against which Mr. DeRosear applied the state income tax allowance, is fairly accurate or is sheer self-serving speculation. Even if the Court accepted the Debtors' calculation as a means to decipher the total miles the Debtors typically drive in one month and did not question whether traveling all those miles was reasonably necessary,[19] the Court would not be able to use

---

18. $1.499 − $1.059 = $.44 × 100 = $40.00 ÷ $1.059 = 41.55%; $997.27 − $400.00 = $597.27 × 100 = $59,727.00 ÷ 400 = 149.32%.

19. Presumably, the Debtors would wish the Court to utilize their amended figure since that would yield many more miles per month and per year. [$400.00 ÷ $0.29 = 1,379

that figure to determine how much the Debtors might spend for fuel per month because the Debtors did not testify how many miles they are able to drive per gallon of gasoline. Since they both drive relatively recent model vehicles and since much of their driving is rural highway driving, one would expect each of them could go farther on a gallon of gasoline than debtors who drive much older vehicles or who drive mainly in urban settings. Likewise, because their vehicles are not very old, one would expect that their maintenance costs would be low at least for the next few years.

In sum, the Debtors have not given the Court enough specific and consistent information by which a sound finding may be made. As for the U.S. Trustee's recommendation, it is clear that fuel prices did increase after the Debtors filed their petition. It is not a given, however, that the price level at the time of the hearing will continue for the next three to five years. On balance, the 50% increase in the U.S. Trustee's recommendation is warranted. The Court, however, is left with the impression that the amended recommendation may still be slightly low and, in turn, is left with the need to conjure up another number.[20] Accordingly, the Court will allow a transportation expense of $275.00.

■ *Recreation.* The U.S. Trustee recommends $50.00. The Debtors request $269.00.

In their October 20, 2000 written objection to the motion, the Debtors set forth the following explanation for this requested amount:

> Recreation by the Debtors has been calculated in an unusual fashion, which is listing items which are non self-indulging recreation. Their claim is made up of $39.00 for the care of three dogs for food, grooming and vet bills; $40.00 for one night dining out; $30.00 per month spent on grandkids; and $160.00 spent monthly for lunches at work.

(Attach. at 3.)

The Debtors offered no documentary evidence to support the amount requested. Mr. DeRosear's testimony was limited to a restatement of the written statement. Mrs. DeRosear did not testify regarding this expense item. At best, the written statement offers a breakdown that supports the "dollar figure" requested. It does not explain why the Debtors must maintain three dogs or why they cannot prepare sack lunches from the amount allotted for food. Gifts should be funded from the catchall "personal" category. Accordingly, the Court will allow a recreation expense of $50.00.

*Home Insurance.* The U.S. Trustee recommends $50.00. The Debtors request $54.00.

---

miles per month × 12 = 16,548 miles per year v. $997.27 ÷ $0.29 = 3,439 miles per month × 12 = 41,268 miles per year.] If Mrs. DeRosear really does drive 3,768 miles per year for personal travel, the amended figure would be consistent with the estimated 37,500 miles the Debtors set forth in their written objection to the auto installment recommendation. Assuming instead that the Debtors each work 5 days a week and not taking into account any vacations or holidays in order to accommodate some unknown amount of personal travel, the first request would appear to be too low and the amended

request too high. [50 miles + 80 miles = 130 miles × 5 = 650 miles × 52 = 33,800 miles per year ÷ 12 = 2,817 miles per month.]

20. For example, 2817 miles per month ÷ 18 miles per gallon = 156.5 gallons × $1.50 = $234.75. Allowing an additional $15.00 per month or $180.00 per year for routine maintenance should suffice given the age of the vehicles. Using the Debtors' amended figure, 3,439 miles per month ÷ 18 miles per gallon = 191.06 gallons × $1.50 = $286.58 + $15.00 = $301.58.

The recommendation mirrors the Debtors' original request. On direct examination, Mr. DeRosear testified that the cost of Debtors' home insurance had increased by $4.00 a month. The U.S. Trustee did not cross-examine him about this matter and did not challenge his representation in closing argument. Accordingly, the Court will allow a home insurance expense of $54.00.

 *Life Insurance.* The U.S. Trustee recommends nothing be allowed for this line item. The Debtors request $317.00.

On direct examination, Mr. Vandenberg explained that whole life insurance is typically disallowed as a savings feature and term insurance is typically disallowed when both debtors are employed and have no dependents. He observed that both Debtors were earning fairly good incomes. On cross-examination, he declined to change his opinion based on the Debtors' written representation that their request related in some way to a mortgage. He likewise refused to change his recommendation based on any allegation that Mr. DeRosear was uninsurable.

In their October 20, 2000 written objection to the motion, the Debtors set forth the following explanation for this requested amount:

> The allowance of this expense is critical for the Debtors. The life insurance involved is mortgage insurance on a decreasing term basis. Mr. DeRosear is presently and literally uninsurable now. For him to have to give up this insurance would be working a tremendous possible hardship on Mrs. DeRosear, considering the expenses, the mortgage, etc.

(Attach. at 3.)

On direct examination, Mr. DeRosear testified that he had carried a life insurance policy with New York Life since high school and that he and his wife had taken out their other policies with Northwest Mutual when they were first married. He volunteered that the Debtors discontinued one of their policies when they no longer could afford it. Mr. DeRosear stated he regretted having done so because he had been uninsurable since he "broke" his back in 1987. On cross-examination, he clarified that he had a total of three whole life policies and his wife had one term policy.

On direct examination, Mrs. DeRosear testified that she would not be able to afford to keep their current home if her husband died without life insurance. On cross-examination, she reported their current mortgage carries a fixed rate and should be paid off when she is in her early sixties.

The Debtors have failed to convince the Court it should not rule in the U.S. Trustee's favor as it has done in so many past bench rulings and in two prior published decisions. *See Woodward*, 265 B.R. at 193; *Matter of McReynolds*, 253 B.R. 54, 63 (Bankr.S.D.Iowa 2000). That is, the Court agrees that whole life insurance policies amount to savings vehicles and expenditures for such policies typically should be disallowed. Nevertheless, the Court might have been inclined to approve a very modest allowance for one of Mr. DeRosear's policies if the record supported his representation that he is uninsurable. As stated during the discussion of the clothing allowance, the Debtors should have provided some probative evidence of Mr. DeRosear's condition. Simply put, the Court is unwilling to accept his bare assertion that he is uninsurable as the unequivocal truth of the matter.

Moreover, the Court has no information regarding the terms of the individual whole life policies, the costs of the premi-

ums or the named beneficiaries. Indeed, the Court is left to wonder why the Debtors' testimony shed no light on their written assertion that the requested amount is related to mortgage insurance. The record otherwise indicates Mrs. DeRosear is employed and should have the ability to support herself in the event Mr. DeRosear should die first. That she might not be able to stay in the homestead that has been in her husband's family may be unfortunate but it is not outcome determinative. Notably, ·the homestead requires more maintenance than that found in most other 707(b) settings, and it is located a significant distance from her work thereby contributing in part to the previously discussed high transportation costs. Accordingly, the Court will not allow any amount for whole life insurance.

As for Mrs. DeRosear's term life insurance, the Court faces the same deficit of information. Notably, the Debtors' written objection does not address a fact pattern in which Mrs. DeRosear predeceases Mr. DeRosear. Neither Debtor testified to any need that Mr. DeRosear might have for the policy on his wife's life. Again, the record indicates that he too is employed and should have the ability to support himself in the event Mrs. DeRosear should die first. Accordingly, the Court will not allow any amount for term life insurance.

■ *Cancer/Heart/Disability Insurance.* The U.S. Trustee recommends nothing be allowed for this line item. The Debtors request $150.00.

On direct examination, Mr. Vandenberg noted the supplemental insurance in question does not provide medical benefits but rather provides coverage for expenses re-lated to hotels, transportation and meals should one need to seek cancer-related, heart-related or disability-related treatment. It was his belief the Debtors would be better off setting aside $150.00 in a savings account. On cross-examination, he reiterated his belief that buying coverage for incidentals was not a wise use of one's money.

In their October 20, 2000 written objection to the motion, the Debtors set forth the following explanation for this requested amount: "[T]he cancer, heart and disability insurance is an insurance that will likely be necessary. It is also supplemental in nature on hospitalization." (Attach. at 3.)

On direct examination, Mr. DeRosear affirmed that the cancer, heart and disability insurance policies covered incidental expenses related to the specified conditions. He included payment of deductibles in the definition of incidental expenses. He believed the monthly cost of the three policies was around $150.00. He acknowledged the Debtors had carried the policies for at least ten years but they had not had a need to use them to date. On recall, Mr. Vandenberg calculated the Debtors had spent $18,000 over the past ten years for the policies in issue.

The Court shares the U.S. Trustee's concerns about this line item. The Debtors have not established that there will be a future need for this insurance. There was no indication that either one suspects they have or will soon have cancer or a heart condition. Mr. DeRosear does have some degree of disability related to a back injury;[21] however, the record before the Court suggests that condition has existed

---

21. At the time of the evidentiary hearing, Mr. DeRosear testified that Mercy Hospital in Iowa City, Iowa had recently determined that he also suffers from cluster headaches. He reported experiencing various physical prob-lems from the medication he has been taking for that condition. Again, the record does not contain any other evidence regarding this new medical problem.

for many years but has not required use of the supplemental insurance. Additionally, the Court points out the Debtors did not offer a copy of the policy into evidence and, therefore, the types of disabilities for which coverage would be provided is unknown.

Though one might argue the U.S. Trustee's position should entitle the Debtors to a $150.00 savings allotment, the Court would disagree. That is, in a hypothetical Chapter 13 case, the Court would not approve this line item as a reasonably necessary expense in calculating disposable income for the original plan. If post confirmation a debtor incurred health care costs that were not covered by that debtor's general health insurance, the debtor would be able to amend the Chapter 13 plan as necessary or convert the Chapter 13 case to one under Chapter 7.[22] Accordingly, the Court will not allow any amount for special insurance.

 *Auto Installments.* The U.S. Trustee recommends $600.00. The Debtors request $1,224.00.

On direct examination, Mr. Vandenberg testified that $300.00 is the standard auto installment allowance for one vehicle. He noted the Debtors were paying on three vehicles: a 1999 truck; a 1998 Grand Am; and a 1993 van. On cross-examination, he explained that the recommended allowance should be sufficient to cover the purchase of a used car or the lease of a moderately priced economy car. By way of example, he calculated that $300.00 monthly payments over the course of a five year loan

at 9% interest would service a $17,500.00 debt.

In their October 20, 2000 written objection to the motion, the Debtors set forth the following explanation for this requested amount:

> The installment: auto expenses incurred in this matter are legitimate. There is a lease on a 1997[sic] Grand Am which Mrs. DeRosear is using. At the present time, they have to pay $4,698.48 to give up this car. She presently drives 12,500 miles a year just to go to work. The pickup which Mr. DeRosear drives is one of the few vehicles that he can sit in. He averages 25,000 miles a year and the truck is used to haul material. His normal trade-in time is on a three-year basis to maintain safe transportation due to his exposure in winter. There is no ability of these debtors to obtain substitute vehicles or vehicles at a cheaper rate without funds from an outside source or the bankruptcy going through.

(Attach. at 3.)

On direct examination, Mr. DeRosear testified that the Debtors had contacted GMAC to determine how much rejection of the lease would cost. He did not believe the Debtors had enough money to do that. or even to make a down payment on a replacement vehicle. He testified the pickup truck he uses is the only vehicle in which he can ride for any length of time. When the Debtors travel together, that is the vehicle they use. He stated he trades vehicles every three to four years because he is concerned about dependable transportation.

---

22. It is not unusual for a Chapter 13 debtor to incur an unexpected expense, that is otherwise reasonably necessary, during the term of a plan. If the expense cannot be absorbed by the debtor's budget, typically the debtor will move to amend the plan to extend the term up to a maximum of 60 months or to decrease the distribution to the unsecured creditors. Sometimes it is necessary for the debtor to seek both options. If the situation is particularly bleak, the debtor usually falls back on 11 U.S.C. section 1307(a) that provides: "The debtor may convert a case under this chapter to a case under chapter 7 of this title at any time. Any waiver of the right to convert under this subsection is unenforceable."

On cross-examination, Mr. DeRosear reported that he traded a 1997 Chevy pickup for his current four-wheel V–8 Chevy pickup in May 1999. As for the 1998 Grand Am lease, he indicated the Debtors had no intention of retaining that vehicle at the end of the lease. Though the Debtors purchased extra mileage at the time they entered the lease, Mr. DeRosear did not know whether they would owe GMAC some additional amount for high mileage when the lease expired. As for the 1993 Chevy Lumina van, Mr. DeRosear testified that vehicle belongs to one of the Debtors' grown daughters. She uses it daily and pays for the insurance on it. He was not sure whether the Debtors were still making payments on the van because payments for that vehicle did not come out of his part of the Debtors' budget.

On direct examination, Mrs. DeRosear testified she did not know how the Debtors could finance a $17,000 car at $300.00 a month. On cross-examination, she stated the monthly lease payment on her car is $385.00. She explained her understanding of the expense related to terminating the contract as follows:

> For every month that's left in the contract that we turn it in early, we have to pay the full price of that monthly payment, and then if the vehicle is sold for over $8,000—or $8500, they will give us some money back; but we have to pay all the money up front.

(Tr. 55, ¶¶ 2–7.)

Mrs. DeRosear did not know any details about the debt against her husband's pickup truck. As for the van, she indicated every pay period she writes a check for $140.00 against the amount owing on that vehicle. She verified that one of her daughters, who is an unemployed student, drives the van.

If a Chapter 13 debtor intends to pay on a vehicle not reasonably necessary for the maintenance and support of the debtor or a dependent of the debtor and does not propose to pay the unsecured creditors in full over the term of the Chapter 13 plan, the Chapter 13 Trustee in this district will lodge an objection to confirmation that the Court will sustain. In this case, the Debtors did not list the grown daughter as a dependent on Schedule I. Their testimony did not establish that she is a dependent. Accordingly, the Court will not allow any amount for payment on the 1993 Chevy van.[23]

As for the lease on the Grand Am, the Debtors' argument that it would be cost prohibitive for them to surrender a vehicle that requires $385.00 per month to look for a car deal that would require only $300.00 per month is reasonable—for approximately the first year of a hypothetical plan. That is, since neither Debtor testified to the actual remaining length of the lease,[24]

---

**23.** On Schedule D (Creditors Holding Secured Claims), the Debtors indicated that they owed the State Employee Credit Union $8,000.00 on the van and that the vehicle was worth $2,005.00. On June 18, 2000 the Debtors and the creditor entered into a reaffirmation agreement on a 1993 Chevrolet. The Debtors' attorney signed the declaration of attorney for debtors on June 20, 2000 and filed the agreement on June 26, 2000. The agreement requires the Debtors to pay off $5,998.98 plus 11.25% interest in biweekly amounts of $142.00. That would require a monthly budgeted amount of $307.67.

[$142.00 × 26 = $3,692.00 ÷ 12 = (rounded off to whole dollars) $308.00.]

**24.** On June 20, 2000 the Debtors signed an agreement to assume the lease on a 1998 Grand AM with GMAC. The Debtors' attorney signed the declaration on June 26, 2000. A file-stamped date of June 29, 2000 appears next to the signature of the creditor's representative. The document was filed on July 3, 2000. The document does not contain any information regarding the terms of the referenced October 29, 1997 lease, and that lease it not attached to the document.

the Court has only Mrs. DeRosear's quoted testimony that could be interpreted to mean the lease would end in approximately one year.[25] Mr. DeRosear was emphatic that the Debtors would not be exercising any buy-out option. Hence, at that point and assuming they are prudent about driving that vehicle within the limits of the purchased extra mileage, they should be in a position to look for a replacement vehicle for Mrs. DeRosear that would fit within the U.S. Trustee's guideline. That they might not be able to afford a car in the class of a new Grand Am does not persuade the Court to overlook the extra $85.00 per month they should have in years two through five of a hypothetical plan. Accordingly, the Court will allow an installment expense of $385.00 per month for 12 months and $300.00 per month thereafter.

As for the 1999 Chevy pickup, neither Debtor testified about the specific amount of the monthly payment for that vehicle. Based on the payments being made on the other vehicles, the Court deduces the monthly payment on the pickup is $531.00.[26] Consistent with Mr. DeRosear's testimony, the Court would anticipate that the Debtors would wish to keep the pickup they purchased in May of 1999 until May of 2002 or 2003.[27] Though the U.S. Trustee took exception to that degree of rotation in closing argument, the reasoning rested on the misconception that the Debt-

ors were paying over $800.00 per month for the pickup. The U.S. Trustee did not challenge Mr. DeRosear's need for such a vehicle. Accordingly, the Court will allow an installment expense of $531.00 per month for the pickup.

■ *Tractor Installments.* The U.S. Trustee recommends nothing be allowed for this line item. The Debtors request $158.00.

In their October 20, 2000 written objection to the motion, the Debtors set forth the following explanation for this requested amount: "The sum of $158.00 is for a tractor which is necessary for Mr. DeRosear to be able to adequately take care of the mowing necessary and snow removal on a 2.25 acre tract of homestead." (Attach. at 3.)

On cross-examination, Mr. DeRosear testified the tractor was a 25-horsepower garden tractor. Since operating the tractor adversely affects his back, he asks his daughter to take over that chore as often as she can. When asked why the Debtors have retained the homestead given its upkeep is difficult for him and its location requires a long work commute for both Debtors, Mr. DeRosear responded that the homestead was where his father was raised.

The record before the Court is somewhat problematic. On Schedule C (Prop-

---

25. $4,698.48 ÷ $385.00 = 12.2 months.

26. $1,224.00 − ($308.00 + $385.00) = $531.00.

27. The Debtors have not entered into a reaffirmation agreement on the 1999 Chevy pickup with Bank One of Wisconsin, the creditor listed on Schedule D (Creditors Holding Secured Claims) as holding a claim of $28,000.00 against the vehicle. $3,000.00 of that amount is listed as unsecured. According to the Debtors' Statement of Intentions,

they intended to retain the vehicle in question. Like so much of the information provided by the Debtors in this case, that Statement is incomplete. That is, the Debtors failed to check off how they would accomplish retention of the vehicle. Since the creditor has not moved for relief from the automatic stay, it may be that the Debtors were current on their payments as of the date they sought relief in this forum. *See generally Matter of Woodward,* 265 B.R. 179, 188 n. 20 (Bankr. S.D.Iowa 2001) (discussing reaffirmation of debt that is current at the time of filing).

erty Claimed As Exempt), the Debtors claimed the tractor exempt as a tool of the trade. Their testimony did not support such a characterization. Parenthetically, the Court notes no party in interest filed an objection to their claim of exemption within the 30 days following the conclusion of the section 341 meeting or requested more time to do so within that timeframe as otherwise permitted and required by Federal Rule of Bankruptcy Procedure 4003(b). *See generally In re Alexander*, 239 B.R. 911, 914–15 (8th Cir. BAP 1999), *aff'd* 236 F.3d 431, 432 (8th Cir.2001) (finding Chapter 7 trustee's exemption objection, that mirrored Chapter 13 trustee's successful exemption objection in preconversion Chapter 13 case, was timely brought within 30 days after the conclusion of the creditors' meeting in the converted case).

More troubling to the Court in the instant matter is that the Debtors' written objection and verbal representations implied that the $185.00 per month payment on the tractor would be an ongoing expense. That portrayal appears to be contrary to the information the Debtors provided on Schedule D (Creditors Holding Secured Claims). In that document, they listed John Deere Credit as holding a claim of only $1,500.00 against a 425 John Deere Tractor worth $4,500.00. Then, according to the reaffirmation agreement the Debtors and Deere and Company entered into on June 14, 2000, the Debtors actually owed the creditor $772.95 as of the petition date. The Debtors' attorney signed the affidavit or declaration of attorney for debtors on or about June 26, 2000 and filed the agreement on July 3, 2000.

According to the terms of the reaffirmation agreement, the Debtors agreed to pay the $772.95 claim in monthly payments of $158.85.[28] If the Debtors complied with the terms of the agreement, they should have paid off the debt in five months.[29] The record does not suggest that the Debtors will need to replace the tractor within the next three to five years. Accordingly, giving the Debtors the benefit on the amount of the last month's payment, the Court will allow an installment expense of $159.00 per month for 5 months and nothing thereafter.

■■■■ *Personal.* The U.S. Trustee recommends that nothing be allowed for this line item. The Debtors request $95.00.

The recommendation mirrors the Debtors' original request. In their October 20, 2000 written objection to the motion, the Debtors set forth the following explanation for adding this requested amount:

> There are actual expenses not shown which should be considered. These other expenses would be for haircuts, cosmetics, toiletries, Kleenex, toilet paper, paper towels, toothpaste, mouthwash, and soap, in the amount of $95.00 per month. The parties pay $16.00 a month for trash, $23.00 a month for a dumpster, and $10.00 a month for laundry soaps.

(Attach. at 3.)

The Debtors offered no documentation in support of their request. Neither Debtor testified about any of the specific items in this category. On direct examination, Mr. DeRosear did testify regarding the education expenses referenced in Paragraph D in the exhibit attached to their "Amendment To Petition." In accordance with state regulations, he must complete certain courses related to his teaching po-

---

**28.** The documents attached to the reaffirmation agreement suggest the balance included the finance charge.

**29.** $772.95 ÷ $158.85 = 4.87 months.

sition within a five-year time frame. He stated very generally that he had completed some of those courses already and must complete the rest by the summer of 2003. Assuming the actual number of remaining $100.00 credit hours is 30 as represented in the Debtors' written objection and assuming Mr. DeRosear is not being reimbursed for that particular cost by his employer, the Debtors' budget seemingly must accommodate an education expense of $3,000.00 before the summer of 2003.

As this Court has previously stated, the Court realizes the personal expense category is a catchall category that serves as a slight cushion in the U.S. Trustee's holistic approach in analyzing a case for substantial abuse. *See Woodward,* 265 B.R. at 194. That is, if the U.S. Trustee has allowed higher than normal requests in certain categories, the recommendation for the personal category may be kept to a minimum or deleted altogether. As explained by the following exchange between Debtors' attorney and Mr. Vandenberg over the recent increase in fuel-related costs, the U.S. Trustee's recommendation that nothing be allowed for the catchall category tracks generally with the increased amount allowed for electricity:

Q. Mr. Vandenberg, can I ask you a similar question regarding the allowance that's made for home heating?

A. Same answer, basically.

That's a hot topic right now, and obviously last month was three times more than anybody expected. It's going to go down this month. So to say that the price—or this allowance should be adjusted three times is probably inaccurate.

It's 210, which is higher than I usually allow. I usually see about a 150 to 180 figure.

The 210 I did not question.

(Tr. p. 16, ¶¶ 9–21.)

The Court recognizes that the U.S. Trustee accepted a number of the Debtors' requests that exceeded the range the U.S. Trustee typically recommends. Nevertheless, the Court believes some cushion is warranted to cover not only many of the items the Debtors specifically identified for this category, along with the educational expense that must be addressed within approximately the next two years, but to lessen the difference between a few of the recommendations and requests. Accordingly, the Court will allow $100.00 for the personal expense category. Parenthetically, the Court points out that the $10.00 amount for laundry soaps belongs in the "laundry/dry-cleaning" category and will so allow it in addition to the personal expense category.

### *Monthly Balance*

The sum of the allowed monthly expenses is $4,109.00 Subtracting that amount from the rounded off monthly income figure of $4,426.00 yields monthly disposable income of $317.00 for 5 months. At that point the monthly allowance for the tractor installment ends and monthly disposable income increases by $159.00 to $476.00. Approximately 7 months later the monthly allowance for the Grand Am installment ends and monthly disposable income increases by $85.00 to $561.00.

### II. The Substantial Abuse Analysis.

Based on the above calculations, the Debtors will likely have between $18,381.00 and $31,845.00 disposable income over the next three to five years.[30] Since their projected expenses include

---

**30.** Over three years: [$317.00 × 5 months = $1,585.00] + [$476.00 × 7 months = $3,332.00] = $4,917.00 + [$561.00 × 24 months = $13,464.00] = $18,381.00. Over

payments on scheduled secured debts they intend to continue to service and since they have no scheduled priority unsecured debt, the disposable income they would generate over the next three to five years would be available to satisfy between 42.45% and 73.55% of their scheduled unsecured nonpriority debt.[31]

Clearly the projected distribution is not insignificant.[32] Furthermore, one must recognize that the distribution would likely be larger if the Debtors moved to a home that required less maintenance and upkeep and that was located nearer their places of employment. While the sentimental reason underlying the Debtors' desire to continue living in their current homestead may be understandable, it does not justify permitting them to erase an otherwise

manageable debt load via a Chapter 7 proceeding.

The Court must also note that the Debtors indicated on Schedule D (Creditors Holding Secured Claims) that they owed $75,000.00 to Farmers Savings Bank. That debt is secured by their homestead which they valued at $120,000.00. That is unusual. It has been this Court's experience that very few debtors who resist a section 707(b) motion have substantial equity in their home. Additionally, the Court observes that these Debtors might be able to pay off one of their two mortgages within the near future—meaning more disposable income might be available to service their debts in the later year or years of a three to five year plan.[33] In sum, permitting the Debtors to retain their

---

five years: $4,917.00 + [$561.00 × 48 months = $26,928.00] = $31,845.00.

**31.** [$18,381.00 × 100] ÷ $43,300.00 = 42.45% and [$31,845.00 × 100] ÷ $43,300.00 = 73.55%. Parenthetically, the Court points out these calculations do not take into account either the trustee's commission and the attorney's fee in a Chapter 13 context or the accrual of interest under a repayment plan outside of bankruptcy. Likewise, the amount of unsecured debt does not factor in any personal deficiency the Debtors might owe if they do surrender the van. The Court concludes such additional amount would be de minimis under the facts of this particular case.

**32.** In calculating the percentage distribution, the U.S. Trustee accepted the Debtors' statement on Schedule F (Creditors Holding Unsecured Nonpriority Claims) that they owed a total of $43,300.00. This Court, likewise, used that figure but not without some reservation. That is, whereas the amount of the unsecured debt owed Bank One of Wisconsin on the Chevy pickup appeared as $3,000.00 on both Schedule D (Creditors Holding Secured Claims) and Schedule F, the amount of the unsecured claim owed GreenPoint Credit/Greentree Credit Corp. appeared as $3,000.00 on Schedule D but as $13,000.00 on Schedule F. *See supra* note 3. (On cross-examination, Mrs. DeRosear stated she was

uncertain about the amount the creditor realized from the resale of the mobile home. She speculated it might have been $32,000.00.) Of course, it may be that the $13,000.00 amount includes a revolving line of credit but that cannot be determined with any certainty because the Debtors failed to complete Schedule F. By that the Court means the Debtors listed the names of the creditors and the amounts they owed those creditors, but they did not include any of the other required information about those obligations.

**33.** On July 13, 2000 the Debtors signed two reaffirmation agreements with Farmers Savings Bank ("Bank"). The Debtors' attorney signed the declarations of attorney for debtors on July 17, 2000, and the creditor's representative did so on July 19, 2000. The agreements were filed on July 24, 2000. In one, the Debtors reaffirmed a mortgage debt of $16,955.51 at 8.25% interest and agreed to pay $512.83 per month commencing July 4, 2000. In the other, they reaffirmed a debt of $58,402.65 at 9.10% interest and agreed to pay $584.66 per month commencing September 4, 2000. The agreements were submitted for filing with one set of documentation. It appears that the former debt might require a balloon payment of $11,823.17 in August 2001. There is no reason to conclude, however, that the Debtors would not be able to work out a suitable arrangement with the Bank or

disposable income in lieu of paying their unsecured debts would amount to a substantial abuse of the Chapter 7 provisions.

CONCLUSION

WHEREFORE, the Court finds that the U.S. Trustee has overcome the statutory presumption in favor of granting Chapter 7 relief and, therefore, the motion to dismiss must be granted.

A separate Order shall be entered accordingly.

### MONTHLY EXPENSES (In Whole Dollars)

| ITEM | SCHEDULE J | EXHIBIT B | "AMENDED J" | ALLOWED |
|------|-----------:|----------:|------------:|--------:|
| Home Mortgage | 1097 | 1097 | 1097 | 1097 |
| Electricity | 210 | 210 | 210 | 210 |
| Water/Sewer | 50 | 50 | 50 | 50 |
| Telephone | 100 | 75 | 104 | 100 |
| Cable | 80 | 30 | 30 | 30 |
| Home Maintenance | 150 | 100 | 178 | 154 |
| Food | 300 | 300 | 300 | 300 |
| Clothing | 150 | 50 | 200 | 100 |
| Laundry/Dry Cleaning | 0 | 0 | 0 | 10 |
| Medical | 175 | 100 | 226 | 226 |
| Transportation | 400 | 150 | 997 | 275 |
| Recreation | 250 | 50 | 269 | 50 |
| Charitable Contributions | 50 | 50 | 50 | 50 |
| Home Insurance | 50 | 50 | 54 | 54 |
| Life Insurance | 317 | 0 | 317 | 0 |
| Auto Insurance | 128 | 128 | 128 | 128 |
| Supplemental Health Insurance | 150 | 0 | 150 | 0 |
| Taxes | 100 | 100 | 100 | 100 |
| Auto Installments A | 1224 | 600 | 1224 | 916 |
| Tractor Installment B | 158 | 0 | 158 | 159 |
| Personal | 0 | 0 | 95 | 100 |
| **TOTAL** | **$5139** | **$3140** | **$5937** | **$4109** |

A. $916.00 for 12 months; $831.00 thereafter.

B. $159.00 for 5 months; nothing thereafter.

another lender to cover that amount with equally favorable terms conducive to prompt payoff of that particular debt. Certainly the significance, if any, of the balloon payment was not a matter that either the Debtors or their attorney addressed at any stage in the proceedings.